[Crim. No. 619.   Fourth Dist.   Oct. 30, 1942.]

THE PEOPLE, Respondent, v. LOUIS R. HOPPER, Appellant.

Daniel A. Knapp for Appellant.

Earl Warren, Attorney General, and R. S. McLaughlin, Deputy Attorney General, for Respondent.

BARNARD, P. J.—A jury found the defendant guilty of grand theft and he appeals from the judgment and from an order denying his motion for a new trial.

The appellant is a mining engineer and dealer in mining claims and mining products. For several years he has maintained an office in downtown Los Angeles. During 1941, he was interested in and trying to develop a silica mine in Nine Mile Canyon, somewhere above Mojave. At the same time Mr. Charles E. Moore, who lived in Ontario, had a lease on a mining claim on property owned by John Prado at a spot called Crystal Springs in or near Death Valley. It is about 240 miles between these two mines. Mr. Moore's mine was being operated by his son, Vincent Moore. They had at that mine an air compressor, for which Mr. Moore had paid $1,100 the preceding spring, and a jack hammer and certain other tools for which he had paid $500. The compressor was located in some cottonwood trees close to the cabin and spring and up against a bank, and was connected with a pipe line which ran some 200 feet up the hill to the mine itself. On five different occasions between July and the middle of October, 1941, the appellant had visited the Moore mine with one of the Moores in connection with a proposal that he sell the products of that mine. On one of these trips the appellant looked at the equipment and remarked that "it was a mighty good compressor." During the fall

of 1941, appellant made several unsuccessful attempts to obtain the use of this compressor, having told the Moores that there was no talc in their mine in paying quantities.

Mr. Moore visited his mine on November 20, 1941, at which time the compressor was there in position and the jack hammer and other tools were locked up inside the compressor. When he returned, about a month later, the compressor, jack hammer and tools were gone. He testified that he had never given the appellant, or anyone else, permission to remove them. Some weeks later, with the aid of a deputy sheriff, the compressor and other tools were found at the appellant's mine in Nine Mile Canyon. A serial number on the compressor had been chiseled off, the marks indicating that this had been recently done.

On November 22nd or 23rd, 1941, the appellant asked a Mr. Forker, who was engaged in the trucking business at a place near appellant's silica mine, what he would charge for a trip to Death Valley if they got a compressor there. Forker said he would make the trip for $25. Vincent Moore testified that three or four days before November 30, 1941, the appellant came to his home in Ontario and asked him if he was "going up to the mine very soon." He replied "no" and the appellant asked, "You are not going up the next week or two are you?" He replied, "No" and the appellant then said: "I may have a job for you over near Barstow— and I may like to have you take the compressor over there." On November 28, 1941, the appellant had another conversation with Forker, telling him that he had not yet decided whether to get the compressor from Death Valley or one from near Los Angeles. At that time, he drew a map for Forker, showing how to get to the Crystal Springs mine, and gave him an exact description as to where and how the compressor was located and attached, which description coincided exactly with the location of the Moore compressor. He also told Forker that it would be unnecessary to give him a written order as there would be no one at the Crystal Springs mine, and further stated that if he decided to take that compressor he would send him a telegram saying "O. K."

Forker testified that the appellant told him if he made the trip to take along wrenches to disconnect the pipe and to bring the compressor but not the pipe; that on November 30, 1941, he received a telegram from the appellant saying

"O. K."; that he found the place and the compressor just as described to him by the appellant; that the cottonwood trees around there were the only ones he saw on that trip; that he disconnected the pipe and loaded the compressor on his truck and took it to the appellant's mine; that the appellant was there when he arrived; that the appellant then said that he had bought the compressor from a man named Monovitch for $750, making a small down payment on it; that the appellant stated that the man from whom he bought the compressor had mislaid his keys to the lock and he ordered them to force the lock; that this was done and the jack hammer and other tools were inside the compressor; that he then noticed that the serial number had been recently removed and asked the appellant "if the compressor was hot"; and that the appellant replied "he didn't think it was, it wasn't supposed to be." It appears, however, that the appellant made no inquiries of the Moores until after his arrest about six weeks later.

The appellant testified that while at the Moore mine he had seen this compressor but had not closely observed it; that he thought the Moores' compressor was then at their home and did not know that the compressor which was at Crystal Springs during the latter part of November belonged to Mr. Moore; that a few days before November 29, 1941, a man who looked like a laborer came into his office in Los Angeles; that this man said his name was Monovitch and he lived at Adelanto; that this man wanted to sell him a compressor and told him exactly where it was located, which was exactly where Mr. Moore's compressor had been located; that on November 29, 1941, he purchased this compressor, jack hammer and other tools from Monovitch for $100 down and a balance of $650; that he desired also to buy the pipe line but Mr. Monovitch said it belonged to Mr. Prado; that he paid the $100 down payment in bills and took a receipt for that, signed by Monovitch, but did not receive any bill of sale or contract of sale; that Monovitch was to call at his office for the balance of the payments; that he had never seen Monovitch since except that he saw him once at a distance on the street; and that he bought this compressor from Monovitch without seeing it, without knowing what it was worth and without making any investigation as to his title because Monovitch looked honest and he had always found miners to be straight and honest men.

After his arrest the appellant told a deputy sheriff that

the compressor which he had bought from Monovitch and which he had directed Forker to get was located at New Crystal Springs on property run by Monovitch, that this was around the hill from Old Crystal Springs, and that the compressor he had directed Forker to get was not located on Mr. Prado's property. At the trial he testified that he knew there was but one Crystal Springs and that he had directed Forker to get the compressor from Prado's property and from the exact spot where Moore's compressor had been. The appellant also told the deputy sheriff that he did not know where Monovitch lived or worked and that he had never had his address. Before the trial he told Mr. Moore that Monovitch lived at Fontana and at the trial he testified that Monovitch had given him his address as Adelanto. On at least two occasions after his arrest and before the trial the appellant endeavored to get the Moores to ''drop this case,'' offering them an interest in his mine and other inducements if they would do so.

Appellant's first contention is that the evidence is insufficient to support the verdict and judgment. While he concedes that the evidence amply proves ·that the compressor and tools which he directed Forker to get and which he received belonged to Mr. Moore and that these were taken without Moore's permission, he contends that the evidence fails to show any criminal intent on his part. In effect, it is argued that his testimony that he bought a compressor from one Monovitch, that he thought Moore's compressor had been removed to Moore's home, and that he did not know that the compressor which was then at Crystal Springs belonged to Mr. Moore, should have been accepted, and that the other evidence is not sufficient to show criminal intent on his part. He makes numerous complaints about the other evidence, relying on supposed conflicts and possible inferences therefrom, all of which affect the weight of the evidence only and which need not be here considered. It clearly appears from the other evidence that the appellant knew that the Moores had a compressor at this Crystal Springs mine, that he knew exactly where it was located and how it was attached, that he had endeavored to obtain the use of this compressor, that he talked to Forker about getting a compressor at that location, that this conversation was probably before he first claimed to have seen Monovitch, that he gave Forker specific directions for finding the compressor but told

him to wait for further orders, that about that time and probably thereafter he ascertained that no one would be at the Moore mine, that he then instructed Forker to go and get the compressor, that he made no investigation as to the ownership of the compressor although when it was delivered to him Forker suggested to him that it was probably "hot," that without making any investigation he directed Forker to get a compressor from the very spot where he knew Moore's compressor had been as late as the middle of October, that when arrested he made statements in connection with the matter which differed from the facts as testified to by him and as established at the trial, and that he attempted to have the case against him dismissed. These and other circumstances are sufficient to support the jury's implied finding of criminal intent and there is nothing about the appellant's explanation which was conclusive upon the jury or which nullifies the other evidence. We seem to have here a reappearance of the familiar third person who so frequently appeared in cases during the prohibition era, the man whom no one knew and who could never be found.

It is next urged that the court erred in excluding evidence of certain conversations. In the first instance, a witness who testified that he had loaned the appellant $100 with which to buy the compressor, was asked what was said at the time he advanced the money and an objection was sustained. Aside from other considerations, this witness did testify that he loaned the appellant $100 for this purpose and that a few days later the appellant showed him a receipt showing that he had paid Monovitch $100 on a compressor. No reversible error appears in this connection or in connection with three other conversations which it is claimed should have been admitted, none of which could possibly have had any effect on the issues before the court. With respect to the fifth conversation which was excluded, the appellant was asked as to what Monovitch had said at the time the purported sale of this compressor was consummated. An objection to that question was sustained. In that connection the appellant offered to prove that Monovitch had then stated to the appellant that he had this compressor for sale, that this compressor was located at Crystal Springs, that he had been on the property for a week or two and had found the property worthless as far as talc was concerned, that Mr. Moore had moved his compressor and all the tools, having been kicked out by Mr.

Prado, and that the compressor was under the trees against the bank and had the jack hammer and tools within it, and that the appellant had replied he knew where that would be exactly. The only material portion of the offered evidence which was not brought out by other evidence is that Monovitch had stated to the appellant that Mr. Moore had removed his compressor and tools. The appellant was allowed to testify that Monovitch had told him that his compressor was in the exact spot where Moore's compressor had been, and he testified that he thought Moore's compressor was then at Moore's home and did not know that Moore owned the compressor which was then on the Prado property. With these alleged facts clearly brought out it would add little to let him testify that Monovitch had told him that Moore had removed his compressor from the property. However he got that information or idea, he testified that he thought Moore's compressor was at Moore's home, that is, that it had been removed from the Prado property. The important thing here is whether he believed that Monovitch had a compressor at that place which he in good faith attempted to purchase. It clearly appears from the appellant's testimony that he claimed to have believed at the time that Moore had removed his compressor, that the one then on the property and which he sent for belonged to Monovitch, and that he purchased the same from Monovitch. The rejected testimony would have added nothing which could have affected the result. The jury did not believe the rest of the appellant's testimony and it is not reasonable to think their view would have been altered by the slight addition he desired to make. A reading of the appellant's own testimony clearly discloses why the jury did not accept any of it. While we think this part of the rejected testimony should have been received, the error in its rejection could not be held to be prejudicial.

The appellant complains of two instructions which were given. Among the general instructions which are usually given was the one which reads: "A person must be presumed to intend to do that which he voluntarily and wilfully does in fact do, and must also be presumed to intend all the natural, probable and usual consequences of his own acts." It is argued that this instruction was improper here since the intent with which the appellant took this property was a specific issue involved and under such circumstances it cannot be presumed that one intended to commit a crime.

This was among the general instructions and the court repeatedly instructed the jury with respect to the matter of specific intent, as related to this case, in other instructions which will be later referred to.

In another of the general instructions, relating to a principal and an accessory, these words were used: "In this connection you are further instructed that if you find from the evidence beyond a reasonable doubt that L. R. Hopper was not actually present when the personal property of Charles E. Moore was taken but that said personal property was taken by an innocent party under the direction and instruction of the said L. R. Hopper, then you must find the defendant guilty as charged." It is urged that this instruction should have included the words "with the knowledge that it was the property of the said Moore, and without reasonable excuse for said taking," or equivalent language. It must be conceded that this instruction is deficient in the respect noted. However, the court instructed the jury that it should consider all of the instructions together and should not "single out any one 'or more of the given instructions and consider it or them separate and apart from the other given instructions"; and after the general instructions the court specifically instructed the jury that if it found that the appellant caused the removal of this compressor without the permission of the owner thereof "you must nevertheless acquit the said Louis R. Hopper of the charge of grand larceny, unless you find beyond a reasonable doubt that at the time he caused said removal he intended to steal it." And again, "You are instructed that if you find that the defendant Louis R. Hopper at the time of the taking of the compressor described in the information herein honestly believed he had purchased it, and that the title was in him, you must acquit him of the crime charged against him." Another instruction reads: "You are instructed that you cannot convict one of an intent to steal property which he believes to be his own. He may be careless and omit to make any effort to ascertain whether that property which he thinks he owns, belongs to another, but, so long as he believes it to be his own, he cannot feloniously steal it." And the last instruction given to the jury was: "You are instructed that the crime of grand larceny must consist of two elements, the act constituting the larceny, and an intent to commit a theft; and that unless you are convinced beyond a reasonable doubt

that the defendant did both the act constituting the crime and also intended to commit the crime, you must acquit him." We think these instructions cured any errors in the other instructions, in view of section 4½, article VI, of the Constitution. We have read the entire record and are not of the opinion that any errors which appear have resulted in a miscarriage of justice.

The judgment and order are affirmed.

Marks, J., and Griffin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 27, 1942.