[Crim. No. 1853.   Third Dist.   July 31, 1944.]

THE PEOPLE, Respondent, v. W. C. REESE, Appellant.

Hugh K. Landram and John J. Taaffe for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

PEEK, J.—The information herein charged the defendant with the crime of murder. At the conclusion of the trial the jury returned a verdict finding him guilty of murder in the second degree. His motion for a new trial was denied and he was sentenced to imprisonment in the state prison at San Quentin. From the final judgment of conviction and from the order denying the motion for a new trial he has appealed to this court.

In his statement of "Reasons relied upon for the reversal of the judgment and order" defendant has set forth ten grounds of alleged error, in general relating to the sufficiency of the evidence, rulings of the trial court in the admission and rejection of evidence, misconduct of the district attorney, and error in charging the jury.

A résumé of the pertinent facts as disclosed by the voluminous record and briefs is as follows:

At the time of the homicide the deceased, Collie Mitchell,

and his family, consisting of his wife and four children, resided in the town of Firebaugh in Merced County. Lawrence Mitchell, the eldest child, was employed by defendant as a ranch hand. He roomed and boarded with the family of one of defendant's ranch foremen, H. E. Spurlock, whose dwelling was located on the defendant's ranch. On the afternoon of the fatal shooting the deceased and his brother-in-law Royal Gage drove to the city of Merced and stopped at the bar referred to as Jack's Place where Mitchell had five or six bottles of beer. After about two and one-half or three hours at Jack's Place they drove to Taff's Tavern in the town of Planada, where deceased again ordered beer. When the decedent arrived at Taff's, the defendant was seated at the bar. The two men had been acquainted for approximately five years, during which time Mitchell had worked for defendant on his ranch on two or three different occasions, the last time in 1942. They engaged in conversation during which they discussed the probability that Lawrence would be drafted. There is evidence that deceased asked appellant to claim farm deferment for the boy but that appellant informed him that was for the draft board to decide. While this conversation was in progress, one J. H. Nancarrow, his wife Beatrice, and his sister-in-law, Mrs. Coye Hall, entered the barroom. Mr. Nancarrow stated that defendant told him that deceased and Gage were looking for trouble and that he, Reese, said ''You won't let two of them jump on me, will you?'' Nancarrow also testified that after he, the deceased, and the defendant ''kidded'' about the straw hat the defendant was wearing, he heard deceased say to appellant, ''You're sore at me, Cliff,'' but he did not hear the defendant's reply. Also during their conversation the deceased asked defendant for a job and defendant told him there was no opening. Defendant then asked Nancarrow in behalf of deceased if his employer needed any tractor drivers, to which Nancarrow replied that there might be a place for a scraper man but that deceased declined the job. Nancarrow left the barroom for the lavatory which was located outside of the building. Immediately following his departure he heard the outside door of the tavern close and noticed the defendant and the deceased ''probably 12 or 15 feet from him.'' He heard deceased say to defendant, ''You're nothing but a dirty bastard''; the witness Gage testified to similar words by the deceased; that defen-

dant, after he "stood there for a second," replied, "That's all right," then went toward his car and drove off. He further testified that as defendant was going toward his car the deceased said to him, "You'll fire the boy, [Lawrence] go out and fire him," but that defendant made no reply. Nancarrow further stated that decedent, upon returning to the barroom, pounded the bar with his fist and referring to Reese, stated that he had been wanting to "call the son-of-a-bitch for a long time and I sure told him," (Mrs. Nancarrow and Mrs. Hall, in general, testified to the same effect) and added "He'll steal anything he can pick up," and "if it's too heavy for him to pick up, if there is an Oakie or Arkie there he'll have them load it for him." Mr. and Mrs. Taff testified that the deceased, while cursing the defendant, further stated that "he had a score to settle with Reese" and that he was going to "get him." Taff cautioned deceased to stop swearing as ladies were present, whereupon deceased apologized to the ladies, and he and Gage left. Mitchell and Gage then returned to the Spurlock residence on defendant's ranch to have Lawrence drive them back to Firebaugh. He was unable to drive them, and the two men walked to the Bagwell house, which was approximately 150 feet from the Spurlock dwelling, but Bagwell also was unable to drive them home. While the three men were conversing, Spurlock called to deceased and Gage to come and have supper with them. Gage left first closely followed by Mitchell. According to members of the Spurlock family, the deceased, while preparing for dinner, was in jovial spirits, laughing and joking as was his habit. The shooting occurred shortly thereafter.

According to defendant's testimony, after he left deceased following the incident at Taff's bar in Planada, he drove to the Bagwell dwelling and talked with Bagwell about the ranch work done that day. He remained there two or three minutes without getting out of his car and then drove to his home, about a half mile away. Upon arriving home he asked his wife not to cook their dinner for awhile because he had to see about lining up the work for the next day. He stated the gun used in the shooting was in the car all this time, and that he always kept a gun in the car or truck because of predatory animals on the ranch. He then drove back to the Bagwell place, and when he stopped his car he put the gun, which

334

was in a holster, in his belt. Defendant further stated that at Bagwell's he intended to get a truck to inspect certain portions of the ranch; that in walking toward Bagwell, who was cleaning some jars next to the house, he saw Mitchell at the Spurlock house and called to him, and that as Mitchell approached he spoke to him telling him to "keep off my premises." Mitchell replied that he was going "to whip" the defendant, calling him a "Texas longhorn son-of-a-bitch" and that he, Mitchell, was going to whip Reese "like he told me he would over at Planada." Defendant's reply was that "I told him I had told him once before to keep off my property and am asking him again to keep off there." Mitchell replied that he would "come back again whenever he got ready." After again cursing defendant, Mitchell said, "I can whip you any time and I will whip you every time I see you," and that he was going "to kill me." The defendant further testified that during this conversation Mitchell continued to come toward him; that lying on a pile of dirt by the cesspool and near the path between the Bagwell and Spurlock houses was an iron pipe; that Mitchell picked up the pipe and carried it in both hands over his right shoulder as he advanced; that the defendant told him to stop but that Mitchell continued toward him; that the defendant then backed up a step or two; that when Mitchell was within five or six feet of him he tried to stop him by shooting into the ground approximately one foot in front of the deceased, but he kept coming; that he was fearful of being killed or injured by Mitchell and shot a second time, again only to stop him and not to injure him any more than was necessary. The bullet passed through the leg approximately six inches above the knee; that Mitchell then dropped the pipe, grabbed his "leg with one hand and I guess his hat with the other," and walked toward the Spurlock home; that defendant then returned to his car and drove home. The second shot severed the femoral artery, from which deceased bled to death.

After leaving the scene of the shooting appellant drove a short distance and put the gun and shells in a vineyard, which he later found for the officers. He then went home, and after a few minutes started for the home of his attorney in Merced. On the way he stopped at Taff's place and talked with Mrs. Taff. He also stopped at the Nancarrows' and talked with Mrs. Nancarrow. Then in the company of his

attorney, Mr. Braucht, he went to the home of Mr. H. K. Landram where the case was discussed. While this discussion was in progress Mr. Braucht drove to the ranch to ask Mr. Bagwell if he would come to Mr. Landram's home for an interview, but Bagwell was not at home. The meeting at Mr. Landram's continued until approximately 11 p. m. when the defendant in the company of his counsel, surrendered to the authorities. Attorney Landram previously had telephoned the authorities that defendant was with him and would surrender himself.

The next witness called in relation to the shooting was Henry Bagwell. Upon direct examination he testified that Reese first came to his home around 6:30 o'clock in the evening and remained about ten minutes. As Reese left, Mitchell and Gage arrived; that Mitchell told him his son would not drive them home because he had been drinking; the deceased then said "I like to have whipped your boss a few minutes ago over at Planada; that Spurlock then called and Gage left immediately while Mitchell reiterated what he had previously stated about Reese and added "I can whip him . . . and I will"; that Reese returned in approximately twenty-five minutes; that when he stepped out of his car he walked to within ten or twelve steps of where Bagwell was working and called to Mitchell, whom Bagwell then saw coming from the Spurlock home; that he observed Mitchell as he approached, and in general recounted the conversation between the two men substantially as given by the defendant. He testified deceased had his hat in his left hand and he saw nothing in his right hand. His testimony regarding the actual shooting was that after the first bullet was fired into the ground in front of Mitchell he "kind of stepped back"; that after the second shot Reese went to his car and Mitchell walked toward Spurlock's home; that he did not see the pipe at the time the sheriff first was at the ranch at 8:30 p. m. but that he did see it when the sheriff visited the ranch a second time at approximately 12:30 a. m. that night.

Upon cross-examination Bagwell stated that from the time he heard the first word spoken between the two men until the first shot was fired he did not look up; that he did not know whether Mitchell had picked up anything or not; that he could see Mitchell's left side and not his right side; that the pipe

had been near the cesspool for ten days or more; that he saw it there around noon time of the day of the shooting; that someone from the sheriff's office found it near the bell pole that night; that at the time of the shooting the men were three to four feet apart; that Reese backed up before he fired the two shots and that he believed Mitchell to be intoxicated.

The third witness to the shooting was Mrs. Bagwell. When first interviewed by the sheriff and the prosecution, as well as defense counsel, she informed them all that she neither saw nor heard anything at the time of the shooting. However, during the course of the trial she was called by the prosecution and testified that as she was coming from the barn she heard the defendant call the deceased; that his hat was in his left hand; that she could not tell whether deceased's right hand was up or down "or how it was" as he walked toward the defendant; that there were trees between herself and Mitchell; that the first shot was fired when the parties were about four or five feet apart; that she saw the dust from the first shot and that Mitchell stepped back "just about a step"; that she recognized the pipe which was introduced in evidence as one she had seen "near the cesspool."

On cross-examination she testified that after the shooting she saw the same piece of pipe at the same place near the cesspool. She further testified that about 10 o'clock that evening a car drove up to their home and that a man called "hello" and asked to see Mr. Bagwell; that she informed him he was not home; that it was dark; that she did not see the man, and that he immediately left in his car. This man later was identified as Mr. Braucht, one of defendant's attorneys who had gone to the ranch to get a statement from Mr. Bagwell.

Mr. Landram, also one of defendant's counsel, testified that while he was at the Bagwell home discussing with Mr. Bagwell his statement in relation to the facts surrounding the shooting he mentioned to Mrs. Bagwell that her husband had informed him that she neither had seen nor heard anything in "reference to this matter, is that right?" that in reply to this question Mrs. Bagwell stated, "Yes, if I had been there this thing would not have happened. . . ."

The sheriff testified that at approximately the hour of 8:30 o'clock on the evening of the shooting he went to the ranch and at the point where the shooting occurred found the bullets and marked the spots on the ground; that it was

dark and he was using a flashlight; that he did not see a pipe at that time; that he returned to the ranch about 12:30 a. m. and at that time discovered the pipe. Upon cross-examination he testified that at the time of his first examination he did not know a pipe was involved in the case and did not look for one; that it was not until after Reese had surrendered to the district attorney that he had any knowledge concerning a pipe, and that the pipe was found where the defendant said it was.

The bell pole, near which the shooting occurred, was located between the Spurlock and Bagwell houses, and closer to the latter. It was constructed of 4 x 6 timber 12 or 14 feet high, on which a dinner bell was mounted. A path ran between the two houses and passed the cesspool mentioned at a point approximately 36 feet from the Bagwell house.

█ Defendant's first contention is that as a matter of law the evidence was insufficient to justify the verdict of the jury. As we have noted, the evidence is in sharp conflict as regards the material facts of the case. █ It is an elementary principle of law that when the facts are reasonably susceptible of two or more inferences the reviewing court is without power to substitute its deductions for those of the jury. In other words a reviewing court must view the evidence in the light most favorable to respondent. █ Applying this well established rule to the present case we must hold that the evidence was sufficient to support the verdict.

█ However, as was said in the recent case of *People* v. *Dail*, 22 Cal.2d 642, 650 [140 P.2d 828], "in a close case where the evidence is sharply conflicting, substantial and serious errors vital to defendant that may have resulted in a miscarriage of justice must be regarded as prejudicial and grounds for reversal." (*People* v. *Albertson*, 23 Cal.2d 550, 553 [145 P.2d 7]; *People* v. *Silver*, 16 Cal.2d 714, 723 [108 P.2d 4].)

With this recent admonition of the Supreme Court in mind we have exhaustively examined the testimony in regard to defendant's specific charges of error. Not from the standpoint of the weight thereof, as such determination would be outside of the province of this court, but rather from the viewpoint of whether such testimony was sufficient to present issues of fact to the jury for its consideration under proper instructions.

■ Defendant's second point of alleged error is that the trial court erred in refusing to instruct the jury on his right to evict a trespasser and instructing the jury that such right was not involved in the present case. The attacked instruction is as follows:

"I instruct you that you may not consider the defense talked of by the attorneys for the defendant and described by them as the right to evict a trespasser, because the evidence in this case is that the defendant did not shoot deceased because he was trespassing."

It is true the defendant testified that he had no thought of harm to his property when he fired the two shots. However, his testimony and that of other witnesses does show that he had previously warned Mitchell to keep away from the ranch; that in spite of this warning Mitchell returned; that when defendant, according to his testimony, again told him to stay off the ranch, Mitchell, instead of complying with defendant's orders and leaving the ranch, advanced in a threatening manner, holding a pipe over his shoulder and cursing the defendant and threatening injury. Reese admittedly was upon his own property and admittedly had the right to order the deceased to stay away. "Instructions should not ignore any findings of fact which a jury might reasonably make upon the evidence before them." (*People* v. *Newcomer*, 118 Cal. 263 [50 P. 405].)

Viewing the evidence in the present case in the light of such rule it cannot be said that the jury could not reasonably have found that Mitchell was a trespasser upon defendant's land. Of course the jury was not bound to accept such evidence, yet assuming that it did, it then would become necessary to construe the acts of the defendant and the deceased immediately prior to the shooting in accordance with the provisions of section 197 of the Penal Code, which is the contention of the defendant. Such code section, in part, is as follows:

"Homicide is also justifiable when committed by any person in either of the following cases:

1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or,

2. When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors,

by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein; or,

3. When committed in the lawful defense of such person, . . . when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; . . . such person, . . . must really and in good faith have endeavored to decline any further struggle before the homicide was committed; . . . ."

In the early case of *People* v. *Flanagan,* 60 Cal. 2 [44 Am. Rep. 52], where a comparable question was presented to the court for determination, it was said that although "human life can not be taken to prevent a mere trespass upon property . . . . [yet] for the purposes of defense and prevention everyone is entitled to use whatever force may be necessary—even to the extent of taking the life of a felonious aggressor (*People* v. *Payne,* 8 Cal. 341), and a homicide committed under such circumstances is justifiable in law."

The court therein, in construing the words "intent" and "endeavor" as used in the code, further stated that:

"Either an intent or endeavor to execute such a design will be sufficient to justify resistance for prevention, in defense of person or property. The law of self-defense is a law of necessity; and that necessity must be real or apparently real. A party acting under it may act upon appearances; and he will be justifiable in acting upon them, even though they turn out to have been false. Whether they were real or apparently real is for the jury, in a criminal case, to decide upon all the circumstances out of which the necessity springs. If from all the evidence in the case they should find that the circumstances were such as to excite the fears of a reasonable man, and that the defendant, acting under the influence of such fears, killed the aggressor to prevent the commission of a felony upon his person or property, he would not be criminally responsible for his death, although the circumstances might be insufficient to prove, by a preponderance of the evidence, that the aggressor was actually about to commit a felony."

In the later case of *People* v. *Hubbard,* 64 Cal.App. 27 [220

P. 315], the defendant ordered one Cope out of his house; the decedent refused to leave, and the two engaged in a scuffle during which the decedent was fatally shot. The court, in reversing a verdict of conviction, observed that under the defendant's theory of the case the shot was accidental and the defendant had a legal right to evict the decedent from the premises using whatever force might rightfully be used for that purpose, and stated:

"It is quite possible that the jurors, because they were not instructed as to his right to eject Cope from the premises and to use all force reasonably necessary to that end, believed that defendant was guilty of a felony in endeavoring to remove Cope by force; and is quite possible that the verdict of murder in the second degree was returned because, and solely because, the jury believed that the shot which killed Cope, even if it were fired accidentally and unintentionally, was fired while defendant was committing or attempting to commit a felony. These considerations will show how essential it was that the jury should be fully instructed with respect to defendant's right to eject Cope and to use force if necessary."

Whether Mitchell was a trespasser when at the Spurlock residence, whether he was a trespasser when elsewhere on the ranch as he admittedly was prior to the shooting, whether the appearances of injury to defendant at the hands of the deceased were "real or apparently real," whether the attendant circumstances were such as to "excite the fears of a reasonable man" and whether the defendant acting upon such appearances and fears killed the deceased, were all directly placed in issue by both the prosecution and the defense and were questions of fact for the jury to decide. Or stated another way, as in the Hubbard case, *supra,* the jurors, because they were not properly instructed as to the right of Reese to order Mitchell off the ranch (but rather they were told to the contrary that it was not an element of the case) might conceivably have based their verdict of murder in the second degree solely upon the ground that they believed that the fatal shot was fired while the defendant was committing or attempting to commit a felony.

Under the testimony and circumstances of the present case the question of trespass as well as the question relating to the threats of force and violence accompanying the trespass

as made by the decedent directly and indirectly to the defendant, all of which were testified to by various witnesses and likewise argued at length by both the prosecution and defense, became a part of and directly related to defendant's claim of self-defense, and concerning which the defendant was entitled to proper instructions.

Therefore, the failure to instruct the jury properly upon all of such elements of the case became "substantial and serious errors vital to defendant that may have resulted in a miscarriage of justice (*People* v. *Dail, supra*), and we must conclude that such error was prejudicial to the defendant, and grounds for reversal.

The third contention made on this appeal is that the court erred in giving a so-called "retreat to the wall" instruction, which reads as follows:

"No one has a right to kill another in self-defense unless such killing is real or apparently necessary for such defense. Before a person can justify taking the life of a human being on the ground of self defense, he must, when attacked, employ all reasonable means within his power, consistent with his safety, to avoid the danger and avert the necessity for the killing."

Except for the second word which has been changed from "man" to "one" this instruction is identical to the one given in the case of *People* v. *Maughs,* 149 Cal. 253 [86 P. 187]. The Supreme Court therein, after commenting upon the development of the modern rule in California as distinguished from the antiquated "retreat to the wall" doctrine, concluded: "No exposition is necessary to show that the giving of this instruction, which imposed upon the defendant the duty of flight, and forbade him the right to stand his ground, was error of such gravity as to demand a reversal of the case."

In passing upon a similar question this court, in the recent case of *People* v. *Zuckerman,* 56 Cal.App.2d 366 [132 P.2d 545], cited with approval the Maughs case, and stated:

"The California courts have definitely rejected the antiquated doctrine that a defendant will be justified in killing his assailant in self-defense only after he has used every possible means of escape by fleeing, even to the extent of 'retreating to the wall,' regardless of whether the imminent peril would justify him as a reasonable person in believing he was

about to receive great bodily harm, or that he was likely to be killed if he did not promptly resort to a deadly weapon." (Citing *People* v. *Maughs,* and other cases.)

That such rule is well founded in common logic and justice is ably illustrated by the statement of Mr. Justice Henshaw in the Maughs case (quoting from *State* v. *Bartlett,* 170 Mo. 658 [71 S.W. 148, 59 L.R.A. 756]), when he observed:

"It is true, human life is sacred, but so is human liberty; one is as dear in the eyes of the law as the other and neither is to give way and surrender its legal *status* in order that the other may exclusively exist, supposing for a moment such an anomaly to be possible. In other words, the wrongful and violent acts of one man shall not abolish or even temporarily suspend the legal and constitutional rights of his neighbor."

Respondent admits the instruction so attacked to be improper upon the authority of *People* v. *Zuckerman, supra,* but argues that appellant lost the right to the plea of self-defense by his own aggressive conduct in that he "went gunning" for the decedent. From this the respondent concludes that as the plea was not available to the defendant, the giving of the instruction embodying the discarded "retreat to the wall" rule, was wholly immaterial. In support of this argument respondent quotes at length and strongly relies upon the case of *Laney* v. *United States,* 294 F. 412 [54 App. D.C. 56].

The defendant therein was convicted of manslaughter. He predicated his case upon self-defense and the trial court instructed the jury upon that subject. Upon appeal the Court of Appeals of the District of Columbia stated it would be unnecessary to consider the assignment of error by the defendant in relation to the law of self-defense (what the alleged error was is not disclosed), since viewing the evidence in the most favorable aspect, self-defense did not enter the case. In the Laney case, the defendant, by his own acts after escaping from a race riot, tested his revolver, and returned to the place of the riot, and in the opinion of the court, as a matter of law deliberately sought a quarrel. The court concluded that "if the facts, in the judgment of the court, are not as such as to admit of this defense, the issue should not be left to the mere speculation of the jury." However, such statement was later qualified when the court said, "of course, the

extent to which a person assailed may go, under a given set of facts involving self-defense, is always a question of fact for the jury," while in a later case, however, *Kinard* v. *United States,* 96 F.2d 522 [68 App.D.C. 250], the same court which decided the Lowry case, said:

". . . It is the function of the jury, under proper instructions, to determine whether either defense [self-defense or killing in heat of passion] is available to the accused under the circumstances of the particular case."

Such being the rule, then in the present case the testimony of Reese, that the deceased kept coming toward him even after the first shot and with an iron pipe raised over his right shoulder, was sufficient to raise the issue of self-defense.

For this court to adopt the argument of respondent in opposition to defendant's contention and hold as a matter of law that the defendant was entitled neither to the plea of self-defense nor to proper instructions thereon would be to disregard completely the obvious conflicts in the evidence as well as the testimony of the defendant. This we cannot do, for as stated in *People* v. *Keel,* 91 Cal.App. 599, 606 [267 P. 161]: "If the testimony of any witness in the case is sufficient to raise the issue it should be presented to the jury."

In view of the defendant's testimony in addition to the conflicting testimony concerning the acts of the participants immediately preceding and at the time of the shooting, the question of whether or not the defendant was acting in a reasonable belief of death or injury was a proper question solely for the jury upon proper instructions on self-defense.

Three additional cases are cited by respondent: *People* v. *Fleming,* 218 Cal. 300 [23 P.2d 28]; *People* v. *Barrett,* 22 Cal. App. 780 [136 P. 520], and *People* v. *Keys,* 62 Cal.App.2d 903 [145 P.2d 589]. In the Fleming case the Supreme Court merely held that the uncorroborated testimony of the defendant was overcome by the testimony of all of the other witnesses, and that there was ample evidence to sustain the verdict of the jury, while the decisions in the Barrett and Keys cases likewise turned upon the questions of the sufficiency of the evidence to justify the verdict of the jury.

In none of the California cases cited was the plea of self-defense denied the defendant even though the record in the last two cases contained substantial evidence that the fatal

shots were fired after the deceased had fallen. The phrase "availability of such defense" in the cases last mentioned is not used in a restrictive sense as regards the right of the defendant to such defense, as respondent contends, but rather it refers to the validity of the defense based upon all of the acts of the defendant and the deceased and other pertinent circumstances surrounding the homicide.

As was stated in the case of *People* v. *Hecker,* 109 Cal. 451 [42 P. 507, 30 L.R.A. 403], at page 462:

"The acts which a defendant may do and justify under the plea of self-defense depends primarily upon his own conduct, and secondarily upon the conduct of the deceased. There is no fixed rule applicable to every case, though certain general principles, well established, stand forth as guides for the action of men and measures for the jury's determination of their deportment." (See, also, *People* v. *McCurdy,* 140 Cal.App. 499 [35 P.2d 569] ; *People* v. *Mesa,* 121 Cal.App. 345 [8 P.2d 920] ; *People* v. *Miller,* 114 Cal.App. 293 [299 P. 742] ; *People* v. *Bruno,* 107 Cal.App. 365 [290 P. 610], and *People* v. *Head,* 105 Cal.App. 331 [288 P. 106].)

■ It is also true, as stated in the Hecker case, *supra*:

"Self-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance, or fault, to create a real or apparent necessity for killing."

However, the court further stated:

"One of the questions of primary consideration for the jury was which of the two men was the aggressor at the time of the fatal affray; which of the two first overstepped the boundaries of the law; which of the two first trespassed upon the legal rights of the other; in short, which of the two by his acts and conduct first put himself in the wrong. For it is obvious that the determination of this must throw a flood of light upon the other question, second in consideration but first in importance, namely, whether at the time the defendant first fired he was acting in self-defense."

■ If, then, a determination of such question must depend first upon the conduct of the defendant, and secondly upon the conduct of the deceased, reference necessarily must be had to the record. Obviously, therefore, the testimony introduced by the defendant cannot be totally ignored and

reference only had to that which was detrimental to him, as does the respondent in its brief. Rather, the entire testimony in relation to "all of the circumstances attending the homicide" (*People* v. *Hecker, supra*), whether introduced by the defense or by the prosecution, must be examined. As previously noted such an examination of the record in the present case discloses a sharp conflict in the evidence. Under such circumstances "the law is well settled that disputed questions as to whether a plea of self-defense is sound . . . are for the jury to determine." (*People* v. *Bruno, supra,* and cases therein cited.) (See also *People* v. *Newcomer, supra.*)

Paraphrasing the statement made by this court in the recent case of *People* v. *Zuckerman, supra,* the testimony of the defendant constituted substantial evidence, and raised an issue as to whether he was reasonably justified in believing, under the circumstances then existing, that he was about to be seriously injured or killed by the decedent, and that it was therefore necessary for him to shoot Mitchell in self-defense. That was an issue which he had a right to have submitted to the jury under proper instructions. In fact such plea was the major issue presented by him at the trial and the testimony in relation thereto raised a proper question for determination by the jury. Under the circumstances as disclosed by the record the trial court properly entertained instructions upon such defense. Unfortunately, however, the instructions so given were improper under the cases cited.

It is true the jury elsewhere was instructed correctly regarding the general principles of law in relation to the plea of self-defense, but that did not overcome the prejudicial effect of the quoted erroneous charge. "The giving of a formal instruction which stated the statutory rule did not cure the error, but instead created a serious conflict, which would normally have the effect of misleading the jury. . . . The result must inevitably have been a confusion in the jurors' minds on a matter vital to the judgment." (*People* v. *Dail, supra.*) (See, also, *Wells* v. *Lloyd,* 21 Cal.2d 452, 457 [132 P.2d 471]; *Jolley* v. *Clemens,* 28 Cal.App.2d 55, 73 [82 P.2d 51]; *Soda* v. *Marriott,* 118 Cal.App. 635, 643 [5 P.2d 675]; 8 Cal.Jur. 633.)

An earlier version of such rule is found in the Maughs

case, supra, when the Supreme Court, in disposing of a like situation, stated:

"Nor is it any answer to this objection that the court elsewhere gave a correct instruction upon the subject. The result served but to confuse the jury and to render it impossible to determine whether in their deliberations they followed the law as correctly or as incorrectly set before them. (*People* v. *Campbell*, 30 Cal. 312; *People* v. *Anderson*, 44 Cal. 65; *People* v. *Wong Ah Ngow*, 54 Cal. 151, [35 Am.Rep. 69]; *People* v. *Messersmith*, 57 Cal. 575; *People* v. *Thomson*, 92 Cal. 506, [28 P. 589]; *People* v. *Pearne*, 118 Cal. 154, [50 P. 376].)"

The fourth contention contains two allegations of error, (1) that the trial court erred in failing to instruct the jury that the defendant had a right to have a revolver in his possession, and (2) that prejudicial error was committed by failure of the court to instruct the jury as to the standard by which the law gauges the conduct of one suddenly assailed. We find no prejudicial error in either contention. ■ As regards the first, our attention has been directed to no portion of the record where issue was made concerning the ownership or possession of a revolver. The instruction tendered by defendant, although correct as an abstract statement of the law, had no bearing upon the issues under consideration. To justify a reversal for such alleged error it must appear from all of the evidence that an error in this respect resulted in a miscarriage of justice. (2 Cal.Jur. 1026, and cases cited.)

■ As regards the second part of defendant's fourth contention it might be said that the instruction given could well have been broadened to include what defendant has termed the standard of conduct of a reasonable man. However, that is not to say, nor is it necessary, that each instruction embody every fact or element essential to sustain or defeat a particular issue. It is sufficient if the instructions, as a whole, substantially and correctly cover the law applicable to the issues.

■ Defendant's fifth point is that the court further erred in giving a flight instruction in the absence of any evidence of flight. The record discloses that immediately following the shooting the defendant left the scene and hid the gun and cartridges in a vineyard. Later that same evening he voluntarily surrendered himself to the law enforcement offi-

cers. Such evidence of flight is manifestly weak. However, under such circumstances we must repeat what this court recently said in the case of *People* v. *Sing Chan,* 64 Cal.App. 2d 167, 172 [148 P.2d 81], wherein a similar question was presented: "We are of the opinion that whether defendant fled or not was a matter for the jury to determine."

The sixth contention is that the court erred in permitting the prosecutor to cross-examine defendant in regard to previous physical encounters. Upon direct examination defendant testified that he had a serious heart condition which had been active since entering a sanitarium in 1927, and that excitement or exertion not only could but probably would prove fatal. It is obvious that by such testimony defendant endeavored to show he was physically handicapped and by reason thereof was further justified in defending himself with a revolver. The defendant having first placed such evidence in the record he cannot be heard to complain of the admission on cross-examination of further evidence. It was proper for the prosecutor to develop by cross-examination that the alleged critical heart condition did not deter appellant from engaging in previous physical encounters with others.

As stated in *People* v. *Lombard,* 131 Cal.App. 525, 532 [21 P.2d 955] :

"It is proper in a criminal case to cross-examine a defendant upon any relevant and material matter testified to on his direct examination, for the purpose of showing conduct or statements inconsistent with his direct testimony."

Appellant's seventh contention is that error was committed when the prosecution was allowed to impeach their own witness, Bagwell, without any showing of surprise or justification.

On the night of the homicide this witness talked with the prosecutor and the sheriff concerning the case and gave a statement of the facts to them. At the trial he was called and testified as a witness for the State. Upon cross-examination he gave categorical answers to suggestive questions which included statements of fact. The facts embodied in the questions were somewhat different from those he gave to the officers on the night of the homicide but in harmony with a statement which he also gave to defense counsel the morning fol-

lowing. At the conclusion of the cross-examination the district attorney asked permission to cross-examine the witness on the ground of surprise.

We have considered all of the testimony of the witness and we are satisfied that there was reasonable justification for permitting the prosecution to question him relative to former inconsistent statements. The question of surprise and the method of proving it are committed largely to the discretion of the trial court. (*Zipperlen* v. *Southern Pacific Co.*, 7 Cal. App. 206 [93 P. 1049].)

The rule is thus stated in 27 California Jurisprudence, page 174, section 148:

"In addition to the requirement that a witness give material testimony, in order that a party producing a witness may impeach him by proof of inconsistent statements, it must appear that such party has been misled and taken by surprise."

A reading of the record reveals that the requirements were met. Furthermore, Bagwell having admitted the inconsistent statements, surely no prejudice resulted. 27 California Jurisprudence, page 172, section 146, reads:

"Improperly allowing or refusing to allow a party to prove the inconsistent statements of his witness is ground for reversal only when prejudice results therefrom."

The defendant's eighth, ninth and tenth assignments of error, respectively, allege misconduct on the part of the district attorney, prejudicial error in the refusal by the trial court to give "all or nearly all of the instructions proposed by the appellant applicable to the law of the case" and refusal by the court to permit the defendant to show that "immediately after the shooting he told his wife the same facts to which he testified at the trial."

We find no merit in such contentions. Nor has counsel shown this court wherein such alleged irregularities resulted in prejudicial error, thereby necessitating a reversal.

The mere fact that all of the one hundred and ninety-five instructions offered by the defendant were not given surely is not a valid ground for reversal. Of the instructions so offered twenty-eight were given as proposed and four were given as modified by the court. In addition many others were given at the request of the prosecution. There is no rule com-

pelling a court to give every instruction offered, no matter how repetitious or immaterial.

Except as otherwise mentioned in this opinion, the trial court "fully, clearly and fairly" instructed the jury on all points of law "material to the case, and necessary for the information of the jury." (8 Cal.Jur. 307, and cases cited.)

Likewise we find no merit in the objection to the refusal of the court to receive in evidence the obviously self-serving statement of the defendant made to his wife immediately after the homicide. The case cited by the defendant in support of such contention (*People* v. *Billings,* 34 Cal.App. 549 [168 P. 396]) is not in point. In that case it appears that shortly after the alleged crime statements were made by one who was subsequently called as a witness by the prosecution, but who, at the time of making the statements, had no knowledge that he "was either thought of, or sought for, as a witness." When called to testify such statements were admitted to rebut the inference which the defense sought to deduce that certain evidence given at the trial was of recent fabrication. No comparable situation exists in the present case.

It is very apparent from the transcript of the proceedings that every issue involved in the case was intelligently and strenuously contested, for which counsel are to be commended. But such observation does not signify that we endorse the acrimonious remarks of counsel. However, as the case must be returned on other grounds, no useful purpose would be served by pursuing this particular matter further.

The judgment and order are reversed, and the cause is hereby remanded for a new trial in accordance with the opinion herein expressed.

Thompson, J., concurred.

ADAMS, P. J.—I dissent. The majority opinion holds that the judgment must be reversed because the trial court gave two instructions which were erroneous. I am of the opinion that there was no error in the giving of one of these instructions, and as to the other, that, while it was erroneous, no miscarriage of justice resulted therefrom. The first of these instructions was that the jury was not to consider "the defense talked of by the attorneys for the defendant and de-

scribed by them as the right to evict a trespasser, because the evidence in the case is that the defendant did not shoot deceased because he was trespassing.''

In support of the instruction and what I have said, I quote from the defendant's own testimony:

''Q. You had no reason to believe that he (deceased) would harm any of your property there, did you? A. No. Q. You had no thought of your property at the time you fired the shots, did you? A. No. Q. Your main thought, your only thought, was to protect yourself? A. Yes. Q. You didn't shoot him because he was on the place and you had told him to stay off, did you? A. No, —— I might have. I don't know how to answer that question. Q. Well, if he hadn't come at you with the bar, you wouldn't have shot him, would you? A. No. Q. So it wasn't because of the mere fact that he was on the property that you owned, that he was shot, was it? A. Well, I was afraid of him. Q. Physical fear? A. Yes, sir.''

Not only was the foregoing instruction proper because defendant testified that he had no thought of harm to his property when he shot, but the evidence shows without contradiction that at the time defendant returned to the scene of the homicide and, after arming himself with his gun, called the decedent to ''Come over a minute,'' deceased was not trespassing but was where he had a right to be, in the home of the Spurlock family about to dine with them in response to their invitation so to do. While it is true that the Spurlock home was upon the ranch owned by defendant, it could not be seriously contended that a person who was in the home of the Spurlocks by their invitation was a trespasser upon the property of defendant. But even if decedent was upon appellant's premises without the latter's permission and against his will, appellant was not, for that reason, justified in shooting him. There is nothing in the evidence which even faintly suggests that when deceased came to the ranch just prior to the shooting he was contemplating the commission of a felony, nor anything showing that while on the premises he committed a felony. It appears without contradiction that he had come there to return his son's car and to ask his son, who was living with the Spurlocks and working for defendant, to drive deceased and Mr. Gage, his brother-in-law, back to their homes in Firebaugh whence the boy had brought them the morning of the homicide. While section 197 of the Penal

Code, cited in the majority opinion, provides that a homicide is justifiable when committed by a person "in defense of habitation, property, or person, against one who manifestly intends or endeavors by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein," where, as here, there was no evidence that deceased intended or endeavored, by violence or surprise or otherwise, to commit a felony, or that he manifestly or at all intended or endeavored, in a violent or riotous or tumultuous manner, or at all, to enter the habitation of defendant for the purpose of offering violence to any person therein, or otherwise, obviously then, the trial court was fully justified in instructing the jury that they should not consider the defense referred to as the right to evict a trespasser. And in this connection we note also, as another reason why appellant was not entitled to rely upon such a defense, that section 197 of the Penal Code provides that a person relying upon the defense of habitation, property or person to justify a homicide, "if he was the assailant, or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed." This defendant did not do.

The other instruction, the giving of which is held to constitute reversible error, reads:

"No one has a right to kill another in self-defense unless such killing is really or apparently necessary for such defense. Before a person can justify taking the life of a human being on the ground of self-defense, he must, when attacked, employ all reasonable means within his power, consistent with his safety, to avoid the danger and avert the necessity for the killing."

That this instruction was erroneous may be conceded since it was condemned in *People* v. *Maughs,* 149 Cal. 253 [86 P. 187]. But in that case prejudicial error was presumed from the giving of the erroneous instruction. However, since that decision, section 4½ of article VI of the Constitution has been enacted, which specifically provides that no judgment shall be set aside or new trial granted in any case on the ground of misdirection of the jury, unless, after an examina-

tion of the entire cause, *including the evidence,* the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.

The question before this court is, then, not whether the instruction was erroneous, but whether, upon an examination of the entire case, including the evidence, it resulted in a miscarriage of justice. In *People* v. *Will,* 79 Cal.App. 101 [248 P. 1078], a case decided in this district, among other errors complained of was the giving of an instruction regarding the consideration to be given by the jury to the testimony of the defendants. This court there said that a similar instruction given in *People* v. *Maughs, supra,* had been severely criticized and that the court had there said that in all future cases where such instruction was given the Supreme Court would hold the giving of it so prejudicial as to call for reversal; but that since the decision in the Maughs case section 4½ of article VI of the Constitution had been adopted and that "While it was error to give the instruction, the evidence against the appellants is so strong and convincing that it cannot be held that there has been a miscarriage of justice." Also in *People* v. *Bartol,* 24 Cal.App. 659 [142 P. 510], an instruction similar to the one given in the Will case and condemned in the Maughs case, was relied upon for reversal; but this court said (p. 666) that the situation must be viewed in a different light from that which obtained when the Maughs decision was rendered, citing the foregoing constitutional provision and *People* v. *O'Bryan,* 165 Cal. 55 [130 P. 1042]. In the latter case the court said that prior to the enactment of the constitutional provision the limitation of appellate jurisdiction to questions of law precluded reviewing courts from weighing the evidence for the purpose of forming an opinion whether the error had or had not in fact worked injury, and that, having no jurisdiction in matters of fact, appellate courts were bound to apply the doctrine that prejudice was presumed to follow from substantial error; that this had produced unsatisfactory results and that it was to avoid them that the constitutional provision had been adopted. It went on to say, page 65:

"This much, however, we think may be safely said. Section 4½ of article VI of our constitution must be given at least the effect of abrogating the old rule that prejudice is presumed from any error of law. Where error is shown it is

the duty of the court to examine the evidence and ascertain from such examination whether the error did or did not in fact work any injury. The mere fact of error does not make out a *prima facie* case for reversal which must be overcome by a clear showing that no injury could have resulted."

Also, at page 66:

"The final test is the opinion of the appellate court upon the result of the error. No doubt this view requires the court, to some extent, to weigh the evidence, and form conclusions upon its weight—a function which, heretofore, has been reserved for the jury. But it cannot be doubted that the legislators, in proposing the amendment, and the electors, in adopting it, intended to put upon the courts the performance of just that function. We are not substituted for the jury. We are not to determine, as an original inquiry, the question of the defendant's guilt or innocence. But, where the jury has found him guilty, we must, upon a review of the entire record, decide whether, in our judgment, any error committed has led to the verdict which was reached. If it appears to our satisfaction that the result was just, and that it would have been reached if the error had not been committed, a new trial is not to be ordered."

Also see *People* v. *Brown*, 22 Cal.2d 752 [141 P.2d 1], where the giving of an instruction regarding the consideration to be given the testimony of defendant was held erroneous under the decision in the Maughs case, but the error was held not prejudicial, citing *People* v. *Bartol, supra,* and stating that the record contained substantial evidence connecting defendant with the homicide, and that the trial court had elsewhere correctly instructed the jury on the principle announced in the challenged instruction.

No presumption of prejudice to a defendant now arises from error or irregularity arising during the course of a criminal trial. On the contrary, we are prohibited from reversing judgments unless it is made to appear affirmatively, to the satisfaction of the court, after an examination of the entire cause, including the evidence, that the error resulted in a miscarriage of justice. (*People* v. *Lapara,* 181 Cal. 66, 72 [183 P. 545]; *People* v. *Watts,* 198 Cal. 776, 793 [247 P. 884]; *People* v. *Mareck,* 17 Cal.App.2d 278, 282 [61 P.2d 972]; *People* v. *De La Roi,* 23 Cal.2d 692, 701-702 [146 P.2d 225];

*People* v. *Cooper*, 36 Cal.App.2d 6, 13-14 [96 P.2d 1012];
*People* v. *Cowan*, 38 Cal.App.2d 231, 246 [101 P.2d 125, 135];
*People* v. *Ratterman*, 38 Cal.App.2d 598, 601 [101 P.2d
750]; *People* v. *Wilt*, 40 Cal.App.2d 124, 128 [104 P.2d 387];
*People* v. *Harrman*, 40 Cal.App.2d 487, 493 [104 P.2d 1063];
*People* v. *Soules*, 41 Cal.App.2d 298, 313-314 [106 P.2d 639];
*People* v. *Pearson*, 41 Cal.App.2d 614, 621 [107 P.2d 463];
*People* v. *Hernandez*, 47 Cal.App.2d 132, 134 [117 P.2d 394];
*People* v. *Hopper*, 55 Cal.App.2d 335, 343 [130 P.2d 798];
*People* v. *Hopkins*, 57 Cal.App.2d 382, 387 [134 P.2d
299]; *People* v. *Russell*, 59 Cal.App.2d 660, 664 [139 P.2d
661]; *People* v. *Keys*, 62 Cal.App.2d 903 [145 P.2d 589];
*People* v. *Mount*, 30 Cal.App.2d 286, 290 [86 P.2d 132]; *People* v. *Neumen*, 35 Cal.App.2d 82, 87 [94 P.2d 611]; *People*
v. *Watson*, 35 Cal.App.2d 587, 590 [96 P.2d 374]; *People* v.
*Hammer*, 74 Cal.App. 345, 348 [240 P. 56]; 2 Cal.Jur. 1008.)

It is intimated, if not directly stated in the majority opin-
ion, that defendant's plea of self-defense was denied to him.
Such, however, is not the case. At defendant's request the
trial court gave eleven instructions on self-defense as follows:

"You are instructed that a homicide is not always unlaw-
ful. A homicide may be entirely lawful and when a homi-
cide is committed in self-defense, it is entirely lawful."

"You are instructed that the law of California does not
compel a person to flee an attack, and seek safety in flight,
but may stand his ground and defend himself, and, under
some circumstances, may even pursue and slay his assailants."

"If you find that the deceased was the aggressor and if
you further find that the defendant as a reasonable man was
justified in believing himself to be in imminent danger of
serious bodily injury or death at the hands of the deceased,
then there is nothing further for you to consider, but you
must return a verdict of not guilty."

"You are further instructed that the defendant in the exer-
cise of the right of self-defense,—if you find the circumstances
justified the defendant in exercising such right, was entitled
to act upon the appearances as they presented themselves
to the defendant at the time the defendant was assaulted
by the deceased if you so found, and if those appearances
justified the defendant in believing as a reasonable man that
he was in danger of the infliction of serious physical injury
upon him by the deceased, the defendant had a right to repel

such assault by the use of all necessary force, even to the point of taking the life of the deceased.''

''The jury may take into consideration the evidence of the defendant's knowledge, if any, at the time of the homicide of previous assaults, if any, made by the deceased on other persons in determining the condition or state of mind of the defendant at the time of the homicide, and whether such knowledge, if any, of the defendant, together with the other circumstances in evidence, as you find them, would reasonably have caused the defendant to shoot the deceased while the defendant was acting in self-defense.''

''I instruct you that where one person threatens another with physical violence, and has the apparent ability to carry out such threats, the person threatened has the right to command the other to desist from carrying out such threats, and to draw or exhibit a revolver or other deadly weapon for the purpose of compelling the other to desist from violence.''

''The defendant was entitled to act upon appearances and if the language and conduct of the deceased was such as to induce in the mind of a reasonable man under all the circumstances existing, and viewed from the standpoint of the defendant, a belief that he was about to be attacked and that serious bodily injury was about to be inflicted upon him by the deceased, it does not matter if such danger was real or was only apparent; and if the defendant acted in self-defense from real and honest convictions as to the character of the danger, induced by the existence of reasonable circumstances, you should find him not guilty, even though he was mistaken as to the extent of the danger.''

''If you find from the evidence that the deceased was unarmed and threatened an assault and intended to commit a battery upon the defendant with the fists of him, the deceased, and if you also find from the evidence that the defendant at the time in question and theretofore was suffering from a heart ailment as the result of which the defendant was not in the same physical condition to withstand an assault and battery as would be a person without such heart ailment, the physical condition mentioned of the defendant would give the defendant the right which healthier persons might not possess of resorting to a deadly weapon, to-wit, a revolver, for his protection against such an assault and battery.''

''One person may kill another upon a sudden quarrel or in

the heat of passion and the killing may be entirely lawful. In this connection, you are instructed that if a person has the right under all of the circumstances of the case to shoot another in self-defense the exercise of this right does not make the act unlawful or constitute it a crime merely because it was done in a sudden quarrel or in the heat of passion. A shooting or a killing done in self-defense is entirely lawful whether or not it is done in a sudden quarrel or in the heat of passion.''

''Homicide is the killing of a human being. All homicides are not criminal, that is, one person may kill another person and not be guilty of any crime under our law, as where such killing was done in the lawful exercise of the right of self-defense. A homicide may be either lawful or unlawful. It is only unlawful homicides that are made crimes by our laws.''

''If you have a reasonable doubt as to whether the defendant acted in self-defense, you must find him not guilty.''

The foregoing instructions emphasized by repetition and elaboration the rules of law most favorable to appellant, and it is obvious that the jury were fully and fairly instructed as to defendant's right of self-defense; and while these instructions to some extent conflict with the one complained of as constituting prejudicial error, it was said in *Wells* v.*Lloyd,* 21 Cal.2d 452, 458-459 [132 P.2d 471], that it does not follow that the giving of conflicting instructions will always mislead the jury and warrant a reversal; that in reviewing instructions an appellate court must read the charge as a whole and give the instructions a reasonable construction from the standpoint of their probable effect upon the jury. Also see *Barsha* v. *Metro-Goldwyn-Mayer,* 32 Cal.App.2d 556, 565 [90 P.2d 371]; *Passarelli* v. *Souza,* 37 Cal.App.2d 1, 5 [98 P.2d 809].

The majority opinion in this case cites *People* v. *Zuckerman,* 56 Cal.App.2d 366 [132 P.2d 545], as comparable to the case before us. But the instruction held erroneous in that case went much farther than the one here under attack. It read:

''The defendant is not necessarily justified, because he actually believed that he was in imminent danger. When the danger is only apparent, and not actual and real, the question is: Would a reasonable man, under all the circumstances, be justified in such belief? If so, the defendant will be so justified if he in fact had such belief.

"If this was defendant's position, it was his right to repel the aggression and fully protect himself from such apparent danger. *If he could have withdrawn from the danger, it was his duty to retreat. Between his duty to flee and his right to kill, he must flee; or, as the books have it, must retreat to the wall, but by this is not meant that a party must always flee, or even attempt flight. The circumstances of the attack may be such, the weapon if any, with which he is menaced of such a character that retreat might well increase his peril. By 'retreating to the wall' is only meant that the party must have availed himself of any apparent and reasonable avenues of escape by which his danger might be averted, and the necessity of slaying his assailant avoided.*" (Italics added.)

In the instruction given in the case before us the jury were not told that if defendant could have withdrawn from the danger it was his duty to retreat, that between his duty to flee and his right to kill he must flee, that is, "retreat to the wall"; here they were merely told that he must "employ all reasonable means within his power, consistent with his safety, to avoid the danger and avert the necessity for the killing." And if, as appellant contends, he shot in defense of his habitation, the foregoing language is not substantially different from the provision of section 197 of the Penal Code, *supra*. By the giving of the other instructions above quoted, the jury were fully instructed that if the circumstances justified the defendant in believing as a reasonable man that he was in danger, he had a right to stand his ground and defend himself, and to repel assault by use of all necessary force even to the taking of the life of his assailant; they were even told that if they found that deceased was the aggressor and that defendant as a reasonable man was justified in believing himself to be in imminent danger of injury or death at the hands of deceased, there was nothing further for them to consider, and they must return a verdict of not guilty.

The Zuckerman case is further distinguishable in that in that case certain instructions requested by defendant, which correctly stated the law as to the right of one assailed to stand his ground, were refused. Also there, the facts of the case are quite different from the facts in the case before us. Here the evidence shows conclusively that defendant, himself, created the situation that resulted in the killing. Knowing that de-

ceased was at the Spurlock house he went from the Bagwell house to his own residence, advised his wife to delay dinner, returned to the Bagwell house, took his gun from his car and put it in his belt, called to deceased to come to him from the Spurlock house, and, as deceased complied, invited a conflict by asking: ''Can you whip me here?'' This evidence plainly indicates that appellant was the aggressor; and while he testified that he was in fear of deceased, his conduct belies such statement.

Since the enactment of article VI, section 4½, of the Constitution it has become, not only the right, but the duty of an appellate court, in reviewing instructions, to read the charge as a whole, to give the instructions a reasonable construction from the standpoint of the jury, and to determine therefrom, and from the evidence in the case, whether it is probable that in the absence of the erroneous instruction the jury would not have returned the verdict, and, therefore, a miscarriage of justice, within the meaning of the constitutional provision, has resulted. As was said in *People* v. *Rogers,* 22 Cal.2d 787, 807 [141 P.2d 722], ''The question for an appellate court under these circumstances is whether, considering the entire record, the challenged instruction may have prejudiced the convicted person's rights. (Const., art. VI, § 4½.) If it is probable that in the absence of a misleading instruction the jury would not have returned the verdict complained of, then there has been a miscarriage of justice within the meaning of the constitutional provision.''

In my opinion the evidence of defendant's guilt is clear and convincing and, in view of the evidence and the entire charge of the court, no different verdict would have resulted had the erroneous instruction not been given. Generally speaking there is little conflict in the evidence. While defendant testified that as deceased approached him he held a piece of pipe in both hands, this is contradicted by both Bagwell and his wife, who testified that they saw no object in decedent's hands except his hat. It was daylight at the time of the shooting and Mrs. Bagwell stated she saw decedent as he was coming from the Spurlock house after defendant called him. She further testified that the piece of pipe in question was at the cesspool, some distance away from the shooting, after the tragedy occurred, and that it had been there for ten days before. The shooting occurred at about 7:00 o'clock

in the evening and at 8:30 o'clock the sheriff was on the scene to investigate. With the aid of Mr. Bagwell and a flashlight he searched the ground where the shooting occurred, located the two bullet holes, recovered one of the bullets and marked the bullet holes. He also traced the blood from the place of the shooting to the Spurlock house, a distance of about 150 feet. He saw many different objects around the premises but neither he nor either of the Bagwells saw the piece of pipe near the scene of the shooting. Later, about 12:30 o'clock, the sheriff returned to the scene to recover the other bullet, and on this second visit he saw a piece of pipe "one step" from the bell pole where deceased was shot. Though both Mr. and Mrs. Bagwell were eyewitnesses to the tragedy, neither of them saw any pipe in the immediate vicinity of the shooting. Doubtless if deceased had dropped the piece of pipe when he was shot, as defendant testified, the sheriff or Mr. Bagwell would have seen it at the place of the shooting when the 8:30 p.m. search was made and the bullet holes found. It was three feet long and one and one-half inches in diameter so that it could not have been easily overlooked. By their verdict of murder of the second degree it is clear that the jurors concluded the deceased did not carry a piece of pipe as claimed by defendant.

Defendant also discredited his testimony that deceased advanced toward him with the piece of pipe held in both hands up to his right shoulder, when he testified that, when he fired the second shot, deceased "stopped and dropped the pipe and grabbed his leg with one hand *and I guess his hat with the other.*" It is not reasonable to believe that decedent thus carried the pipe in both hands and yet had his hat in either hand. Furthermore the testimony as to the conversation between the two men at the time of the shooting is not consistent with defendant's contention that he shot in self-defense. It was as follows:

Defendant: Can you whip me here?

Deceased: I still can if you'll come out in the road, you big Texas longhorn son-of-a-bitch, you're just a coward.

Defendant: I asked you not to come on my premises any more.

Deceased: I'll come to Spurlock's as long as Lawrence [his son] works there.

Defendant: I'll see whether you come.

Defendant immediately followed with two shots fired in rapid succession when the men were about five or six feet apart. When the first shot was fired decedent stepped backward, and after the second said: "Don't shoot me any more, Reese," and retreated to the Spurlock house. If deceased had the piece of pipe as defendant claims, there would have been no occasion for his asking defendant to "come out in the road"; and if defendant fired because of fear of bodily harm he would not have said, "I'll see whether you come." Furthermore, the conduct of defendant after the shooting is not consistent with a shooting solely in self-defense. Immediately after the shooting he drove a short distance away and put the gun and shells in a vineyard. He then went to his home where he remained a few minutes during which he tried to telephone to his attorney, Mr. Preston, at Merced. Failing to contact Mr. Preston he telephoned to and made an appointment with Mr. Braucht, Mr. Preston's partner. On his way to Merced he stopped at Harry Taff's, saw Mrs. Taff, talked with her about a minute, then he went on and stopped at Mr. Nancarrow's and saw and talked with Mrs. Nancarrow. Mr. Nancarrow was not at home. (The Taffs and the Nancarrows subsequently were witnesses for the defense and had been in the barroom during the incident at Planada.) Appellant then went to the home of attorney Braucht and together they went to the home of attorney Hugh Landram where the shooting was discussed. While this discusstion was going on attorney Braucht drove 12 or 15 miles to the Bagwell home to procure Mr. Bagwell to come to attorney Landram's home for an interview, but Mr. Bagwell was not at home. The meeting at the home of attorney Landram continued from about 8:30 to about 11:00 p. m. when defendant, accompanied by counsel, surrendered to the public authorities.

The evidence is uncontradicted that the decedent and appellant had met about an hour before the shooting in the barroom at Planada, about four miles from defendant's ranch, and there had engaged in a conversation and some heated words; that defendant left the barroom and went outside followed by deceased, who called the defendant a vile name but made no gesture toward physical violence. From Planada defendant went to the Bagwell house and after talking with Bagwell, went to his own residence, about a half mile

away, there told his wife to delay cooking the meat, went back to Bagwell's and from there called to deceased at the Spurlock house, about 150 feet away, to come to him. According to the testimony of the members of the Spurlock family, when called out of their house by defendant, deceased was about to dine with them and was in jovial spirits, laughing and joking "as usual." Twice the defendant was in his own home and away from the deceased and yet he chose to arm himself and to invite the deceased into an affray by saying: "Can you whip me here?" As was said by this court in *People* v. *Fitch*, 28 Cal.App.2d 31, 39 [81 P.2d 1019], "The jury was warranted in concluding that if the defendant was really afraid of bodily harm at the hands of the deceased, he might easily have avoided a conflict by remaining at his home." There had been a cooling-off period of about an hour between the incident at Planada and the actual shooting, during which deceased showed no signs of rancor. Had defendant refrained from inviting deceased to fight, no tragedy would have occurred.

There is further reason why this court should affirm the judgment in this case, and that is, that the contentions here made were fully presented and argued before the trial court on motion for a new trial, which was denied. In *Lafargue* v. *United Railroads*, 183 Cal. 720 [192 P. 538], and in *Hulburd* v. *Worthington*, 57 Cal.App.2d 477 [134 P.2d 832], in passing upon the question of whether error had resulted in a miscarriage of justice so as to justify reversal where a new trial had been denied by the lower court, it was said that a trial court is in a much better position than an appellate court to determine whether the verdict of a jury was probably due to errors at the trial, and its conclusion in the matter should not be disturbed unless, under all the circumstances appearing, it was clearly wrong. Here the trial court heard the witnesses and observed their manner of testifying. It was in a much better position than this court can be, to determine whether the testimony of appellant that he was afraid of decedent and killed him in self-defense was convincing and credible. Had that court been of the opinion that there was a miscarriage of justice we must assume that it would have granted a new trial.

I am convinced that the verdict of the jury was just and

that had the instruction complained of not been given, no different result would have followed, that the evidence fully sustains the verdict, and that it has not been made affirmatively to appear that there has been a miscarriage of justice. The judgment should be affirmed.

Respondent's petition for a hearing by the Supreme Court was denied August 30, 1944. Edmonds, J., voted for a hearing.