[Crim. No. 4198.   Second Dist., Div. One.   May 27, 1948.]

THE PEOPLE, Respondent, v. DAN VEZERIAN, Appellant.

Morris Lavine for Appellant.

Fred N. Howser, Attorney General, and Wm. E. James, Deputy Attorney General, for Respondent.

WHITE, J.—Defendant was charged in an information with the crime of murder following the shooting by him of Richard Carreon on August 24, 1946. He 'was tried twice. In the first trial the jury was deadlocked and the court declared a mistrial. The cause was reset and a new jury sworn which found defendant guilty of manslaughter, a lesser offense and one included in the crime of murder, as charged in the information. Judgment was pronounced and defendant was sentenced to state prison with a recommendation that he be confined at Chino, and that the Parole Board favorably consider his application for parole. This appeal is prosecuted from such judgment of conviction and also from the order denying his motion for a new trial.

It is here urged (1) that the evidence is insufficient to support the verdict and that the verdict is contrary to the law and the evidence; and (2) that the court misdirected the jury in matters of law, and that it refused to give certain instructions requested by defendant.

An examination of the record discloses that on the night of August 24, 1946, the Fernando Briones were entertaining about 20 couples at a barbecue in their home and between 10 and 11 o'clock they ran out of beer, whereupon Theodore and Eddie Duron, brothers of Mrs. Briones, Charles Porter and Richard Carreon, all boys between the ages of 17 and 19, volunteered to go out and purchase more beer. Theodore Duron testified that he and his companions went walking around the block from the Briones house, called at one liquor store but were unable to get any beer there, and that he went ahead of the others, entered the liquor store of defendant and inquired of the latter and his brother, John Vezerian, if they had any beer and if he could get two cases. They answered him in the affirmative, and defendant began to fill ·cardboard cases with the beer; meanwhile the other boys arrived, and

the witness' brother, Eddie Duron, asked the price of the beer. Defendant replied it was $6.70 a case "or something like that"; whereupon said Eddie Duron stated that was too much and asked what make it was. Defendant made some reply and he and Eddie Duron began to argue about the beer. Said witness testified that defendant told Eddie that if he didn't like the beer he could get out; "to get the hell out." The witness stated they were still arguing but that all of the boys started to walk out and that Bob Porter said "we will get out," and as they were walking out defendant put his hand on Eddie and pushed him and that Eddie turned around and he and defendant started fighting in the middle of the store. The witness Theodore Duron stated he heard defendant say something about getting a gun, and that he in turn made a motion across his body and said, "don't get it, don't get it, because I got one too," in an attempt to "bluff" defendant. Said witness was wearing no coat, only a khaki shirt. He testified that Eddie Duron and defendant were fighting back of the counter and that he jumped over the counter to stop defendant from getting to the cash register and thus prevent appellant from getting his gun; that he managed to stop defendant before he got to the cash register; that he pushed defendant as far as he could and hit him a few times; that defendant put his hands down and the witness thought he had hurt him, so he jumped over the counter, grabbed his brother Eddie and ran out of the store; that they ran east on Fourth Street 50 or 60 yards, turned into a vacant lot and ran home, and that as they ran they heard "three straight shots"; that none of the boys had a gun; that said witness had had two or three glasses of beer and one shot of whiskey at the party.

The witness Eddie Duron testified that on the evening of August 24, 1946, he attended a wienie bake at the home of his sister, Mrs. Betty Briones; that about 20 couples were present; that they had four cases of beer to start with and when it ran out late in the evening, his brother-in-law asked him and his brother, Theodore Duron, to go out and buy more beer. That, accompanied by Bob Porter and Richard Carreon, they walked around the block and went into a liquor store but were unable to get any beer; that meanwhile, his brother Theodore had gone ahead and was in defendant's liquor store talking to him when the other three boys arrived; that defendant was standing in front of the refrigerator; that the witness then asked defendant what the beer would cost and was told $7.80 a case; that the witness asked why it

was so high and defendant replied that it was Mexican imported beer, ''so I picked up one bottle and looked at the label. It was Mexican imported beer. I forget now the name of it. I put it back and told him that was too much for us, that the beer wasn't really worth that much to us. . . . I told the boys, 'Let's not get it. It's too high.' . . . At that time Dan Vezerian for one reason or another he got sore and he said, 'If you don't like the price get the hell out of here.' And Bob Porter said, 'We are going.' At that time Ricke (Carreon) was standing toward one side and my brother was on the other side and Bob Porter was near the middle of the store, toward the entrance there, so when he said that we turned around and started to walk out. At that time Dan Vezerian followed me. He pushed me on the shoulder. He pushed me hard enough to knock me down, but I was lucky. I more or less expected it because he got mad when I told him it was too high price to pay for the beer, so I didn't fall. I turned around and we both started fighting. . . . he struck me the first blow by striking me in the back while my back was turned, and I was going out toward the door. All four of us were going out. At any rate, when the fight started I remember just then Dan Vezerian saying, 'Well, I am going to get a gun,' and he jumped over the counter. . . . He jumped right over and started to go to the cashier's box. . . . before that when he pushed me we started to swing at each other. That took a very little while, and he said he was going to get a gun and Bob Porter said, 'Wait a while. I will get them out of here.' . . . We didn't know what he (defendant) would do with the gun. He was mad and naturally we thought he was mad enough to shoot us and my brother who was a soldier then, he had his uniform on, his summer uniform with just a shirt. He threw a bluff, what you call a regular bluff. He said, 'I have a gun too, so don't go for your gun.' . . . When my brother made the statement that he had a gun Dan Vezerian had gone over the counter just then and I jumped in front of him, that is between Dan Vezerian and the cash register where I thought he had the gun. . . . So right there me and him both started fighting. I did my best to force him up towards the entrance there. . . . And I hollered to Bob Porter and Ricke and my brother, I turned around and hollered to them to get out of there. . . . Ricke and he (Bob) went out the door. My brother stood in the door. . . . I thought at first he was going out with them, but he didn't. I pushed Dan Vezerian up there. What I wanted to do was push him

up far enough that I could jump over the counter, run out the front door and get a chance to run away without getting shot. Dan Vezerian got away from me. I tore his shirt. I remember I tore his shirt sleeve trying to hold him. He got away from me and he ran around the counter. I remember that very clearly. And he (my brother) stopped with Dan Vezerian right before he got to the cash register, just about a foot and a half away from it and I jumped over the counter to the middle of the store. My brother pushed Dan Vezerian up to the end; then he jumped over and we both ran out of the front door. . . . The fighting took place in the aisle-way. It was more pushing than fighting. . . . I wasn't able (to knock him down) . . . he is too big for that.'' This witness also stated that he saw John Vezerian when he walked into the store but did not get to see him later; that he did not see John and Richard Carreon in a fight; that no bottles were thrown, that he heard one fall but did not remember hearing it break; that he was not more than 20 feet away from the entrance of the store when he heard the first shot, which defendant admitted was the shot that hit Richard Carreon.

Charles R. Porter, referred to by the other witnesses as Bob, testified that when he and the other boys entered defendant's store, the latter was near the refrigerator filling some cases of beer; that defendant's brother, John Vezerian, was also in the store; that one of the Duron boys asked the price of the beer and was told that it was $7.62 a case plus deposit on the bottles; that Eddie Duron picked up a bottle in his left hand and said, ''I don't think that is the right price for this kind of beer.'' That Eddie was holding the bottle with his left hand and pointing to the label with his right; that defendant said, ''If you don't like the beer, you get the hell out of here,'' to which the witness replied, ''It is all right. We didn't want the beer.'' This witness did not recall appellant or anyone else saying anything about a gun, and he proceeded to walk very fast out of the store; that he did not stop when he reached the sidewalk and did not look back inside the store; that he proceeded west and was alone. That he walked to the corner and then looked back; that he took 10 or 15 steps around the corner and then came back to the corner; that he looked back toward the liquor store and saw Richard Carreon and John Vezerian; ''They came out of the door fighting . . . It looked to me like they were exchanging blows this way,'' i. e., trying to strike each other with their fists, right in front of the store. He then continued going

south and shortly thereafter heard three shots; that he kept on going and met Theodore and Eddie Duron around the corner; that none of the boys appeared to him to be intoxicated, although he had seen them drinking. On cross-examination, this witness testified he did not recall seeing the deceased, Richard Carreon, pick up a bottle of wine and throw it across the store.

Police Officer Asdel testified that he arrived at the scene of the shooting about 11 o'clock in the evening; that he saw a person being taken from the scene in an ambulance and that he went into the liquor store near by; that he asked what had happened and appellant said there had been a holdup, and described the four suspects who had come into his store, ordered two cases of beer and after he started to put the beer in the case the suspects grabbed up a bottle, threw it at him; that there was a fight; that then they ran out of the store and he went outside and shot at the suspects. This witness identified the gun used by appellant in the shooting, and also testified that appellant told him that when he shot, he thought he hit one of the bandits because one of them grabbed his stomach, bent over, then straightened up and continued running. This witness also testified that he observed the shelves in the liquor store and that there were a few bottles tilted over and some broken glass on the shelves; that he did not notice any other broken bottles there; that he observed a scratch on appellant's face.

Police Officer McCreadie, a commander of Hollenbeck Detective Bureau, made an investigation of the liquor store on August 26, 1946, at which time appellant told him that nothing had been touched inside the store since the previous Saturday night. This witness read to appellant the police report that he had made to Officer Asdel with regard to the attempted robbery on Saturday night and asked appellant if it contained everything and if it was true, and appellant answered that it was; that after he had read the report to appellant, the latter told him that these suspects had started a fight with him and had thrown beer bottles from the cases; that the witness looked around for broken beer bottles, but did not find any, whereupon he said to appellant: "Well, in your report here you stated that they threw these full beer bottles at you, but I can't find any beer bottles." That they looked around and found a broken wine bottle or two and appellant said, "Well, they must have thrown a broken wine bottle." This witness further testified that defendant showed him where the fight

took place behind the counter, stating that "there was one man on each side of him hitting him, and I asked him how come that none of the bottles were disturbed, and I said, 'When I could hardly get through with one of my police partners without bumping into those bottles,' he says, 'Well, I don't know, none of them got knocked down.' I says, 'Well, they were shoving, pulling and pushing there,' and he said, 'Yes.' I said, 'Well, that is funny.' . . . we walked around from behind the counter and got into the center of the store again and I said, 'Dan, where were you when you ran for your gun?' He said, 'Well, when . . . the last boy let go of me and ran for the front door, I went to get my gun.' . . . it was near this cash register, he stated as they were going out he ran around here towards the front of the store and he told me that he fired at this last man in front of the store. And I spoke up and asked him how many more shots he fired and he stated he fired two shots at the boys as they were running east on Fourth Street from in front of the store, which was three shots."

John Vezerian, the brother of defendant, testified that he was in the store helping the latter and that when the argument started about the price of the beer, he told the group of boys that if the price was too high to call the whole deal off; that appellant went toward the telephone to call the police, whereupon Theodore Duron said not to go for a gun, because he had a gun too; and that Richard Carreon said the same thing; that he saw Richard Carreon throw a bottle of Roma wine; that said Carreon reached over the candy counter, took the wine bottle and threw it at the witness; that the bottle missed him and hit the Royal Host wine shelf on the south wall of the store; that thereafter Richard Carreon "came at me and threw me, pushed me and slugged me out of the store." That thereafter the fighting between them was outside of the store. This witness also testified that the Duron boys ran out of the store followed by defendant; that Richard Carreon turned around and saw appellant. "At the same time he went under his coat and I hollered to my brother, 'Look out, Dan, look out, he's got a gun.' And Dan shot him. . . . Richard Carreon. He was in a crouched position. . . . Then he grabbed his stomach, headed to the east and ran east."

The defendant took the stand in his own defense and testified he was the owner of the liquor stock and merchandise therein here in question and had been engaged in business

there for 10 months; that he had never seen the Duron brothers, Bob Porter or Richard Carreon previous to the evening of August 24, 1946; that about 10:30 or 11, Theodore Duron came in and asked if they had any beer, and if he could get two cases, and was answered in the affirmative; that the beer was imported from Mexico and he had no local beer; that presently the three other boys came in at which time appellant and his brother, John Vezerian, were filling the cold bottles of beer from the refrigerator into the cases; that he was asked the price and he stated the beer cost $7.20 a case, plus the deposit, which was 60 cents; that the boys got into a huddle and when they heard what the price was they didn't want it any longer; that Eddie Duron immediately picked up a bottle from the case to see whether it was imported beer and that he read the label and insisted that the beer was bottled in Los Angeles; that he could see that there was going to be trouble and he immediately told them to get out of the store, but that Eddie Duron took the bottle in his hand and shook it and said it wasn't worth the money, whereupon defendant grabbed the bottle out of his hand and said, "Get out of the store. I wouldn't sell it to you anyhow." Defendant also testified that at the other end of the refrigerator Theodore Duron was picking up bottles and shaking them at John Vezerian saying, "What are you going to do about it?" That John said, "Let's keep it quiet, boys. We don't want no trouble."; that at this time Bob Porter was saying, "We don't want any trouble. I will get them out of here." That also, at this time, Theodore Duron said, "Don't get your gun. I have a gun too."; that immediately after Richard Carreon said the same thing; and Bob Porter also said to him, "Don't get your gun, I will get them out of here."; that defendant said, "I wish you would, because I am going to call the police if you don't get them out of here." Defendant further testified that he went between the counter and the east end of the refrigerator, and as he rounded the corner toward the cash register, he saw a bottle flying which hit a shelf over his head but did not hit him; that it broke into pieces; that he did not know who threw it; that he saw Richard Carreon and Theodore Duron make motions toward their chests or sides to show they had guns, but that he did not see any guns on these two boys. Further, he stated that he owned a gun, a German Mauser which he kept concealed under a white handkerchief on the south shelf of the store; that he finally got to the telephone and dialed 116, when Eddie

Duron jumped over the counter on top of him and started beating him over the head with his fists and that Theodore Duron came around the counter to his brother's assistance and started beating defendant from the other side; that from the time Eddie jumped over the counter, appellant was unable to see what his brother John was doing, but the last time he saw him he was being pushed out the front door of the store by Richard Carreon; that "I ducked down on top of those cases, put my hands over my head and face, and sort of got into a crouch and let them both beat away all they could on my hands and face, and wherever they could get a blow in and, well, when I was there more or less helpless, Eddie jumped over the counter and said, 'Come on, Sal, let's get out of here,' he run around the counter by the register and went out the door with his brother. They turned to the east and ran. Well, I got up, there was no one in the store and I went to that shelf that I—where the case is, where the gun was, and got the gun and come out to the front of the store and kicked the door open . . . an awful fast step . . . I had the gun in my hand . . . When I hit the front door I kicked the door open, I was at the threshold, I noticed Richard Carreon fighting with my brother and as the door swung open both of their attention turned to the door and me. Well, just about that time, Richard turned to me with the . . . left side of his body and went under his coat. . . . And my brother said, 'Look out, Dan', and I thought he was going to use that gun that he had previously said he had in the store, and I thought he was going to use it on me or my brother so I shot him right then and there. After the shot he whirled to his right and sort of, I don't know, his hand was still there, whether he held his stomach or what it was, and he ran east down the sidewalk. . . . He ran off the curb by the telephone pole into the street and then he came back up the driveway, and then went down the sidewalk. . . . Then I saw Eddie Duron and Theodore Duron go about fifty yards away on the same sidewalk running ahead of Richard and I ran to the end of the building and then I fired two shots in the air, more or less one for each. I don't know why I did it. . . . Officer Asdel came and I told him just what had happened and he said, 'after you have closed up the store will you come down to the Hollenbeck Station and make a report,' and I said I would and that is just what I did."

On cross-examination, appellant testified as follows: "Q. Now, when you made that statement, 'Stop! Stop! or I

will kill you,' were you making that at Richard Carreon or were you making it at the two boys that preceded you out of the store? A. At the two boys that preceded me out of the store. Q. So, as I understand it, when you followed these two boys out of that store and you had that gun, your mind was on these boys? A. Yes, sir. Q. When you opened the door there was your brother and Carreon fighting? A. Yes, sir. Q. Were Carreon and Dan Vezerian looking at you when you came out of that store? A. Do you mean John Vezerian? Q. John, yes. I beg your pardon. A. The minute the door flew open both of their attentions turned on me. Q. As a matter of fact, their attention was on that door? A. They didn't know I was coming out. Q. As a matter of fact, two men had preceded you, hadn't they? A. That is correct. Q. Were they fighting when you came out? A. They must have been. Q. I don't want you to guess. A. They were standing in a close position. Q. When you said, 'Stop! Stop! or I will kill you,' did you fire the shot then? No. Q. What happened then? A. I kicked the door open and as I said both of their attentions were turned to me and as the attentions were turned Richard turned away and put his hand under his coat, under his jacket, and my brother said, 'Look out, look out,' and I thought he was going to use the gun, that he said that he had, previously in the store, so I shot him then. Q. And it wasn't until that time then, at that particular moment that you had any fear for your life or your well being? A. Well, no, I was afraid of my life, when I was being beaten behind the counter. Q. You weren't in fear of your life when you were chasing the two boys out of the store? A. No, I wasn't. Q. In other words, you were then satisfied that your life was not in danger? A. Correct. Q. But it was only in the flash of a statement when your brother made this statement to you, is that right? A. Yes. . . . Q. And your brother rather than stepping into Richard when Richard reached for something—— A. He backed away. Q. He didn't run away? A. No. Q. You were afraid for your life at that time? A. Yes. . . . I was afraid for my brother's life also. Q. When you got out of the door there did Carreon have a gun in his hand? A. I didn't see any. . . . I could see both his hands. Q. And he didn't have a gun in his hand? A. No, sir. . . . Q. . . . After you fired the first shot at Richard Carreon and he ran along the street, you were not afraid of your life any more, were you? A. No, sir. Q. You still shot two more shots? A. In the air, yes. . . . Q. Dan, before

those two boys ran out of that store you had not been able to get hold of your gun? A. No, I had not. Q. In other words, they had already gone out of the store on a run before you got your gun? A. Yes, sir.''

Under the foregoing epitome of the evidence produced at the trial, we cannot agree with appellant's first contention that the evidence is insufficient to support the verdict rendered. An appellate tribunal is not authorized to retry the case and to make inferences from the facts proved. That is a function which belongs to the duly constituted arbiters of the facts. We are limited to a determination of whether, upon the face of the evidence, contradicted or uncontradicted, it can justly be held that from the evidence as a whole, sufficient facts could not have been found to warrant the inference of guilt (*People* v. *Ohman*, 67 Cal.App.2d 467; 474 [154 P.2d 463]). In the face of the record before us, were we to substitute our inferences for those drawn by the jury upon conflicting evidence, we would clearly be invading the province of the jury by passing upon the weight of testimony and the credibility of witnesses.

■ Appellant's second contention that the court committed prejudicial error in refusing to give certain instructions requested by him must be sustained.

The homicide having been admitted by appellant, the question of guilt depended upon the claim of justification or self-defense. There was nothing inherently improbable in appellant's account of the shooting, nor can it be said from a reading of the record, that the jury could not have reconciled all of the established circumstances with the theory of appellant's innocence.

This was the second trial of appellant. At his first trial the jury was discharged as "hopelessly deadlocked." And the state of mind of the trial judge as to the verdict rendered is reflected in his statement made following the pronouncement of judgment wherein he stated:

". . . The court recommends favorable consideration by parole board of application for parole."

It is because of the foregoing state of the evidence that the instructions of the court should be subjected to a critical examination.

The altercation and subsequent tragedy occurred after the entry of four men, including the deceased, into appellant's store where he was legally, lawfully and quietly conducting

his business, and was the aftermath of the boisterous and argumentative manner in which the men objected to the price appellant asked for certain merchandise. The deceased and his friends had previously attended a party where some of the guests, including the deceased, had been served intoxicating liquor, including several glasses of beer and several "shots" of whiskey. It was when the supply of liquor at the party was exhausted that the deceased and his friends departed therefrom and went to appellant's store to obtain additional liquor.

The county autopsy physician, Dr. Fredrick G. Newbarr, testified that an examination of the blood of the deceased showed the presence of .16 per cent ethinol, and "That indicates that he was intoxicated." It is true that other witnesses testified that in their opinion the deceased was not intoxicated, but, that he and his associates had been drinking is uncontradicted.

The fight which took place in the store and the threats made by the deceased and one of his companions are hereinbefore set forth.

At the trial, appellant advanced the defense of justifiable homicide, based upon three separate theories: (1) That in committing the homicide he acted in lawful defense of himself; (2) in lawful defense of his brother; and (3) in a legal and lawful attempt to arrest the deceased for allegedly having committed a felony.

Under well-settled rules, requiring no citation of authority, it is established that a defendant is entitled to have an instruction given on his theory of the case, if there is any substantial testimony upon which to base such theory.

Except for the reading of section 197 of the Penal Code, no instructions were given as to appellant's right of justification in the defense of his brother against great bodily injury or with reference to appellant's right of justification if he were engaged in an attempt by lawful means to apprehend a person for the commission of a felony. Appellant had a right to an instruction on these issues based upon his own theory of the case.

█ Appellant offered and the court refused to give the following instruction:

"You are instructed that the defendant, Dan Vezerian, being the tenant and entitled to the possession of those premises known as 3101 East 4th Street, was entitled to the possession of such premises and that the defendant, Dan Vezerian, when assaulted upon his own premises is not bound to retreat to

avoid violence, even though a retreat may safely be made. An intruder who refuses to leave, within a reasonable time, after being requested to depart may be ejected legally by the lawful occupant of the premises, and if such intruder resists his ejection and assaults the lawful occupant of the premises the latter may protect his person and property and may take the life of the intruder if he has reason to believe that his own life, or the life of a member of his family or his property, is in danger, or that he or a member of his family is in danger of receiving great bodily injury.''

This instruction should have been given (*People* v. *Hubbard*, 64 Cal.App. 27, 32, 33, 34 [220 P. 315] ; *People* v. *Reese*, 65 Cal.App.2d 329, 340, 341 [150 P.2d 571]). Respondent contends that appellant's rights were protected by an instruction given by the court in regard to the law that an assailed person need not retreat. We do not think so. It was of the utmost importance to appellant's case that the jury should be fully advised as to his right to eject the deceased and his companions from the premises, lest the jury not being advised as to appellant's rights with reference to ejecting the foregoing persons from the premises and as to what force might rightfully be used for the purpose, might have believed that in endeavoring to remove the persons in question by force, appellant himself was thereby guilty of a crime.

■ And, based on the right of appellant to have the jury instructed upon his theory of the case, we are persuaded that the following proffered and refused instruction should have been given:

''You are instructed that every person who commits an assault upon the person of another with a deadly weapon or instrument likely to produce great bodily injury is guilty of a felony and if you find from all of the evidence in this case that the deceased Richard R. Carreon did commit an assault upon either the defendant, or his brother, John Vezerian, with a deadly weapon or instrument likely to produce great bodily injury you then and in that event will find that the deceased had been guilty of having committed a felony.

''A deadly weapon or instrument likely to produce great bodily injury may include various types of agencies, employed by the attacker, such as a filled wine bottle, which although not inherently dangerous, may assume such characteristics depending upon the manner of its use and if you find from all of the facts and circumstances in this case and beyond a

reasonable doubt that such filled wine bottle was a weapon or instrumentality which, in the hands of the deceased Richard R. Carreon was capable of being used or was used by him in a dangerous or deadly manner and that the said Richard R. Carreon intended to so use, or did use it as a weapon, should the circumstances require, and had the present ability to commit a violent injury upon the person of the defendant, Dan Vezerian, or his brother, John Vezerian, then the character of the instrumentality is established as being a dangerous or deadly weapon.

''You are further instructed that in order for you to find that the deceased Richard R. Carreon was guilty of an assault with a deadly weapon or instrument likely to produce great bodily injury it is not necessary that it be proven that the said Richard R. Carreon actually succeeded in or made an attempt to strike, or hit with, or use the said filled wine bottle upon the person of either the defendant, Dan Vezerian, or his brother, John Vezerian, or anyone.''

It was appellant's contention that the deceased did commit an assault with a deadly weapon or instrument likely to produce great bodily injury upon him and his brother, when, as disclosed by the evidence, the bottle of wine was hurled at them. The matters covered by this instruction were not included in any other instructions given by the court.

■ It was error for the court to refuse to give appellant's proposed instruction advising the jury of the right of any person to make an arrest if he has reasonable cause to believe that the person sought to be arrested had committed a felony and setting forth the amount of force that may be used in effecting such arrest. This instruction had to do with one of appellant's theories of defense, viz., that the evidence showed that he had three times been the victim of felonious acts committed by the deceased and his companions. Because the record contains some substantial testimony on which to base appellant's theory, he was for the reasons heretofore advanced entitled to have the jury instructed thereon. We do not agree with the attorney general that a mere reading of section 197 of the Penal Code was a sufficient compliance with appellant's rights.

■ We are convinced that under the circumstances here present it was of the utmost importance that the following instruction proffered by appellant and refused by the court should have been given:

"You are instructed that under the law a person may act upon appearances; the rule being that a person may have a lively apprehension that he is in imminent danger and believe that his apprehension is based on sufficient cause and supported by reasonable grounds, and that such apprehension is reasonable and warranted from appearances as they present themselves to him. If, however, he acts on these appearances he does so at his peril, because the law leaves it to no man to be the exclusive judge of the reasonableness of the appearances upon which he acts but prescribes a standard of its own, which is, that not only would the person acting on the appearances himself believe that he was in deadly peril or in danger of great bodily injury, but would a reasonable man situated as the defendant was, seeing what he saw, and knowing what he knew, be justified in believing himself in such danger. The jury is not to consider whether or not the defendant was, when he fired on the deceased, in actual peril or danger, but only to consider whether the indications or appearances were such as to induce the defendant as a reasonable man into believing he was in such peril or danger. If you find that he believed reasonably that he was in such peril or danger and that he fired at the deceased under such belief, even though it should appear that the deceased was not armed, you should acquit the defendant."

We are persuaded that the refusal to give the foregoing instruction deprived appellant of the right to have the jury give proper consideration to a defense upon which he mainly relied.

The cumulative effect of the refusal to give the foregoing instructions forces us to the conclusion that the errors were such as to require a reversal when consideration is given to the probable effect of such errors upon the jury's determination of guilt in a case where the evidence admits either of a theory of the guilt or of the innocence of the defendant. Under the facts of the case now engaging our attention, we cannot say that it is not improbable that a conviction would not have ensued but for the errors hereinbefore discussed.

The judgment and the order denying defendant's motion for a new trial are, and each is, reversed.

Doran, J., concurred.

York, P. J., dissented.

Respondent's petition for a hearing by the Supreme Court was denied June 24, 1948.