[Crim. No. 623.   Fourth Dist.   Feb. 15, 1944.]

THE PEOPLE, Respondent, v. WILLIAM F. KEYS, Appellant.

Paul Barksdale d'Orr and Thomas A. Reynolds for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

MARKS, J.—Defendant was charged with the murder of Worth Bagley. After a protracted trial he was convicted of. manslaughter and has appealed from the judgment pronounced upon him, and from the order denying his motion for new trial. Counsel agree that the evidence is sufficient to support the verdict and judgment. However, it will be necessary to summarize the evidence in order to determine if errors of law occurring during the trial constituted prejudicial and reversible error under the provisions of section 4½ of article VI of the Constitution.

Defendant had lived on the desert in Riverside County since 1910. He acquired land there on which he built a home for himself and family. He also acquired land in San Bernardino County north of and adjoining the line dividing the two counties. Land belonging to the Southern Pacific Railway Company lay between the properties.

Defendant operated a mine in San Bernardino County. Some time after 1910 he built a stamp mill, tank, water troughs and a pumping plant on his San Bernardino County property. We will refer to this as Keys mill. There was also a well on the railroad property where he had a windmill which he removed when Bagley acquired the property. In the record this is referred to as Bagley's well. The removal

of this windmill was one of the causes of disagreement between Bagley and defendant. There were roads crossing the railroad property which connected the two properties of defendant. He testified he had used these roads without obstruction or objection for about thirty years. He also testified that one or more of these roads had been opened and in use since about 1874. Defendant started raising range cattle in 1918. It was his custom to let the cattle range on the railroad property. Twice each year he drove them along a road crossing this property when moving them between the summer and winter ranges.

In 1936 Bagley acquired the railroad land lying between defendant's properties. He was then a deputy sheriff. At some indefinite date, probably prior to 1939, he made cement blocks with which to build a house. He complained that defendant's cattle were breaking those blocks while ranging on his land. This seems to have been the start of the differences between the two men. With Bagley's consent, defendant, at his own expense, built a fence which kept the cattle off from about 80 acres of land around the Bagley house which he commenced using, probably in 1939. There may have been other fences and also cattle guards and gates which we are unable to locate because of the manner in which the witnesses testified. When a witness points to a map and says a certain thing is "here" or "there" it is understandable in the trial court but is meaningless on appeal.

Someone shot and killed a cow belonging to defendant and later a Spanish jack. Defendant accused Bagley of killing the animals, which Bagley denied. He became enraged and threatened defendant. Bagley interfered with defendant's travel over the roads across his property and ordered him to stay off. Without going into further detail it should be sufficient to say that the relations existing between the two men deteriorated rapidly. There is evidence that Bagley made threats against defendant which were communicated to him. A disinterested witness testified that defendant threatened Bagley's life although he denied doing so. Both men armed themselves. Bagley usually carried a 38 caliber police special revolver and also sometimes had a rifle when traveling in his automobile. Defendant carried a 30-30 caliber automatic rifle with him in his car. He testified that he regarded Bagley a dangerously insane man. This was the state of the relationship between the two men at the time of the fatal affray

which occurred at about 11 o'clock on the morning of May 11, 1943.

Defendant was the only living witness to the killing and we gather the following from his testimony. On that morning he arose at his usual time, had breakfast and went to Keys mill to pump water for his cattle. He drove over the road across Bagley's property and on to Keys mill. There was an obstruction in the road over Bagley's property which he drove around. He started his pump and pumped enough water to fill two troughs, but not his tank, when his engine stopped because of magneto trouble. Being unable to fix it he took the magneto off, placed it in his automobile and started home over the same road he had traveled earlier that morning. When he reached the Bagley property he saw several obstructions in the road ahead of him. These obstructions, separately placed, consisted of broken glass, of stones, and of yucca logs across the road. There was a sign on a stake in the road about 50 feet beyond Bagley's property line. Defendant drove to a point near the sign and read it: "KEYS This is my last warning Stay off of my property." Defendant backed his car up the road to a point which he believed was on his own property, though it is highly probable that he did not leave the Bagley property. For a distance of approximately 104 feet the road in front of defendant rose to an elevation of about six feet and descended on the other side. Defendant got out of his car and walked forward to a point where he could look over the top of the rise. He saw Bagley approaching, crouched over with his revolver in his right hand. Defendant ran back to his automobile, armed himself with his rifle and stood beside the car. When Bagley reached the top of the rise he fired one shot at defendant. The bullet passed close to his head and hit the door of his car although he was not conscious of this last fact. Defendant immediately returned the fire. He described the subsequent events to an officer as follows: "He said he shot at his gun hand, but he shot a little high; he hit him in the arm, and Bagley turned to the left and started to run, and he ran in a zigzag manner; and I asked him why he was running in a zigzag manner, and he said he thought to make him miss him. He said where he——he said he fired another shot as Bagley was going away from him, and he hit him in the left arm, partially turning him around, and when he partially turned, he fired another

shot and he dropped, he hit him in the side. . . . Deputy Heap asked Keys about the shooting. Keys told Heap that Bagley was coming over the hill, he shot at him; he went back and got his rifle out of the car, shot at Bagley's gun hand and shot a little high and hit him in the upper right arm, and Bagley turned to the left and started running from him in a zigzag manner. Heap told him he was shooting the man in the back, and Bagley said it was an automatic and shot fast. Q. By 'Bagley' do you mean—— A. Or Keys.''

Defendant's rifle was an old model and is what is now sometimes called a semi-automatic. The explosion would eject the shell that had been fired and insert another in the chamber, but pressure on the trigger was necessary to fire each shot.

Defendant's testimony at the trial did not differ materially from the story he told the officers. It is significant that sufficient time elapsed between each of the shots so that he could observe the effect of each and could see that Bagley was running away from him when the second and third shots were fired. It was the opinion of the medical experts that the third shot caused immediate death.

After Bagley fell defendant got into his car, turned it around and drove to his home by a circuitous route which did not cross the Bagley property. He cleaned up, had his lunch, secured another magneto and returned to Keys mill by the same circuitous route. He attached the magneto to his engine and pumped his tank full of water. He climbed a hill which gave a view of the Bagley property but could see nothing unusual. He returned to his car and drove it to about the same place where it had stood during the affray. He alighted and walked up the rise, probably about 50 feet, to a point about half way between his car and where Bagley stood when he fired at him. He did not see Bagley's body which was lying in low weeds and brush off the road. He testified that while he thought he had killed Bagley he was not sure and that Bagley might have been wounded. He returned to his automobile and drove to Twenty-nine Palms where he surrendered to Constable O. J. Cones. Defendant, the constable, David M. Poste, Dr. Gilbert John Leonard and W. E. Ketcham of the Federal Park Service returned to the scene of the shooting, arriving there shortly after 4:00 o'clock in the afternoon. They found the body of Bagley lying prone on its face near the top of the rise and a short distance from the road. The revolver was cocked and was clasped in the

right hand with the forefinger resting on the trigger. No fingerprints were found on it on subsequent examination. Low grass and brush were standing around the body.

Various witnesses described the wounds on the body and photographs show them clearly. There was a rather slight flesh wound on the right arm just above the elbow. From defendant's evidence it would appear that this was caused by the first shot he fired. He testified that he tried to shoot the gun from Bagley's hand but shot a little high. This would indicate that the right arm was not fully extended from the shoulder in pointing the revolver towards defendant but was flexed at the elbow. Dr. Leonard was of the opinion that the shock of this wound was sufficient to have caused Bagley to have dropped the revolver from his hand. Defendant demonstrated the position of the right arm and the revolver when the shot was fired but there is nothing to indicate that position to us.

There was a severe wound in the left forearm. Both bones were shattered and the flesh badly torn. From defendant's account this must have been caused by his second shot.

A lacerated wound was found on Bagley's left side. The bullet entered about 15 inches below the shoulder level posterior to the axillary line on the left side at the tip of the twelfth rib and ranged slightly upward across the body. Surgeons testified that there was dirt forced into this wound; that death followed almost immediately with complete collapse of the entire body; that anything in Bagley's hand would have dropped to the ground. They were of the opinion that the dirt forced into the wound might indicate that Bagley had received this last wound while he was prone on the ground.

An expert was called to the scene of the affray who made an examination, among other things, of weeds and low brush growing adjacent to where the body lay. He found human blood mixed with bone, tissue and dirt on these weeds and brush in close proximity to the ground. From the shape of the stains he was able to determine to his satisfaction that the substances had been projected laterally, parallel to the ground, onto their resting places. Some of the weeds are before us. The stains are clearly visible on some of them and range between six and nine inches above the roots. From these facts, and from the further fact of dirt having been forced into the body wound, he drew the conclusion that

Bagley had received the fatal wound while lying prone on the ground. The same expert found small human blood stains on a pair of trousers found in defendant's home. Defendant accounted for these stains as being the result of nose. bleed to which he was subject.

It should hardly be necessary to say that the foregoing facts and the reasonable inferences to be drawn from them amply support the verdict and judgment. While not disputing the sufficiency of the evidence to support the judgment, defendant argues that errors of law occurring during the trial were so prejudicial as to prevent his having a fair trial and to require a reversal of the judgment.

Defendant offered in evidence three sets of records for the purpose of proving that Bagley not only "on previous occasions had looked and acted like one mentally unbalanced, but that he actually was at times insane." The trial court sustained an objection to their admission and this is now urged as error.

The first group of documents had been used in proceedings before the Board of Pension Commissioners of the Peace Officers' Retirement System, and had resulted in a resolution passed on November 22, 1939, retiring Bagley on December 1, 1939, "on account of permanent and total disability . . . due to the fact that he is incapacitated for the performance of his duties as a Deputy Sheriff. . . ."

Bagley's first application was dated December 2, 1938, and asked retirement "for the reason that I am unable to perform the duties of a Deputy Sheriff." Attached to the application was a letter from C. F. Bayer, M.D., Clinical Director of the Veterans' Administration, Los Angeles, reciting that Bagley's illness had been diagnosed as "Paralysis, right upper extremity, functional." An examination was made by a physician who reported to the board on December 13, 1938. The physician reported his findings as follows:

"This patient has a definite organic lesion of the brain which is, however, very small and is probably located in the region of the left temporal lobe in the posterior portion. In addition to this the patient has a very marked hysteria and many of his symptoms are made up of involuntary simulation. Whether there is also a voluntary element is exceedingly difficult to say. The elements which indicate a functional disturbance, that is, the hysteria, are: the type of sensory loss, the flail-like arm, the voluntary contraction

of the fingers of the right hand in anticipation of a blow with the percussion hammer, the absence of pharyngeal reflexes, and the patient's manner of talking. The patient is at present totally disabled but he would probably not be totally disabled if the hysteria were cleared up.''

Bagley made a second application for retirement, for the same reason, under date of July 24, 1939. Attached to the application is a letter from Bagley's personal physician dated July 22, 1939, which recited that he had known Bagley for several years; that ''it has been revealed that over this period of time a slow change in his mental balance has taken place that was climaxed by the past year's experience. I believe his symptoms are due to a brain lesion from which full recovery cannot be expected, and prognosis is progressive and unfavorable.''

Two physicians examined Bagley and reported to the board. Considerable portions of both reports, made on October 10, 1939, are couched in technical language that means little to the lay mind. No explanation was offered in the trial court. One physician thus expressed his opinion of the case:

''As near as I am able to judge this is a case of hysteria or functional neurosis. His general condition is considerably better than when I saw him on November 7, 1938. During the interim his right hand and arm have practically cleared up. The sensory changes then present have also cleared up. He is more cooperative than I have seen him heretofore. The Romberg is strongly positive and he staggers about in a most peculiar manner holding on to objects and furniture. I consider that he is completely disabled at this time. He seems to be improving and it is trusted his improvement may continue to the point where he may again be able to return to duty. I am unable at this writing to state when this may be.''

The other physician formed the following opinion:

''This man alleges ill health for the past two years, his principal complaints being headaches, vomiting, uncontrollable temper at times, and persistent dizziness so that he is unable to walk without assistance. On physical examination, there is nothing indicative of any organic disturbance of his central nervous system. I can only account for these symptoms, as well as the findings at examination, on a hysterical and neurosis basis. I believe that this man is totally disabled at this time and is unable to carry on the regular

duties of that of deputy sheriff. With a change of environment, occasionally, a very marked improvement occurs in these cases, and they return to normalcy. As to when this might occur, I believe one is unable to state, as frequently they may persist for years."

It is the general rule in California that in a prosecution for murder where the defense of self-defense is interposed, the defendant may introduce evidence that the reputation of the deceased for peace and quiet was bad, and known to him to be bad. Proof of specific acts of violence or proof of a prior conviction for assault are not admissible. (*People* v. *Griner*, 124 Cal. 19 [56 P. 625]; *People* v. *Garcia*, 2 Cal.2d 673 [42 P.2d 1013]; *People* v. *Soules*, 41 Cal.App. 2d 298 [106 P.2d 639].)

Defendant relies on the case of *State* v. *Shahane*, 56 N.D. 642 [219 N.W. 132], where, in a homicide case involving self-defense, it was held error to exclude evidence tending to prove that the deceased was subject to insane seizures and therefore was dangerous; that this was known to defendant. The real reason for that decision was thus summed up by the court: "In all cases of self-defense when it is shown that the deceased was the assaulting party, it is competent to show that the deceased was a violent, dangerous and blood-thirsty man, and so known to the accused."

The North Dakota rule is broader than any announced in any California case to which we have been cited. Even that rule is not applicable under the facts before us. All that the excluded evidence tended to establish was that deceased had brain lesion, described as slight; that prior to October 10, 1939, he was subject to fits of violent temper; that his right arm had been paralyzed although it had improved; that he was then suffering from hysteria or functional neurosis. There was no offer to prove that these conditions resulted in Bagley becoming a dangerous or violent man nor that these conditions existed in 1943. We are cited to no offer to prove that defendant had any knowledge of these conditions other than that Bagley had told him that he had been retired for permanent disability and that he had suffered an attack of amnesia. Under these circumstances the objection was properly sustained since the offered evidence did not tend to establish either that Bagley was insane, with dangerous or homicidal tendencies at the time of the affray, or that defendant had any knowledge of the contents of the above described documents.

Defendant also offered in evidence records of the Riverside County Hospital, to the admission of which an objection was sustained. These records disclose that Bagley suffered from complete amnesia and was picked up on the streets of Riverside on February 18, 1939, taken to the hospital and released to the Veterans' Hospital at Sawtelle on February 22, 1939. The only other matter of interest disclosed by these records is that X-rays of the head, while revealing no definite evidence of a skull fracture, showed a line which might have been "suggestive of a fracture in this region, although the line is not sharp cut as is usually seen, having more the appearance of a vessel." There was no offer to connect this with Bagley's condition in May, 1943, and no evidence that defendant knew anything more about the occurrence than having been told by Bagley of the amnesia in Riverside. Even under the rule announced in *State* v. *Shahane, supra,* the objection was properly sustained.

Defendant also offered in evidence Bagley's affidavit dated January 22, 1941, and an affidavit by his attending physician dated December 11, 1940, which were filed in an action in Riverside County wherein Bagley sought a divorce. The court had evidently ordered Bagley to pay support money, court costs and attorney's fees to his wife. The clear purpose of the affidavits was relief from the order, by postponing the payments, because Bagley was receiving diathermy treatments for arthritis, the cost of which was too great to permit him to respond to the order. We can find nothing in either affidavit bearing on the issues in this case and the objection was properly sustained.

Counsel for defendant complains of several instructions given to the jury. The first is instruction number 9, in which the attention of the jury was called to the fact that defendant had testified as a witness, and stated that the jury should bear in mind the situation of the defendant, the effect on him of the verdict, and the grave interest he must feel in the outcome of the case; that it was proper to consider whether his position and interest had not affected his credibility and colored his testimony. The usual instruction was given that the jurors were the sole and exclusive judges of the weight and sufficiency of the evidence and the credibility of the witnesses.

In California the trial court is permitted to "make such comment on the evidence and the testimony and credibility

of any witness as in its opinion is necessary for a proper determination of the case.'' (Sec. 19, art. VI, Const.; sec. 1127 Pen. Code.)

It is urged that as the trial court singled out the defendant as the only witness whose testimony and credibility was commented upon, there was an unfair inference to be drawn from the instruction that his evidence be regarded with suspicion. It is true that trial courts should be cautious in the exercise of the power given so that the rights of a defendant to a fair trial be protected. (*People* v. *DeMoss,* 4 Cal.2d 469 [50 P.2d 1031].)

The same argument was made in *People* v. *Ottey,* 5 Cal.2d 714, and at page 727 [56 P.2d 193], was disposed of as follows:

''The defendant urges prejudicial error in singling out the defendant's testimony for special comments on the credibility to be accorded it. The court remarked upon the defendant's interest in the case, its opinion on a phase in the testimony that 'things don't happen that way,' and included a charge that if a witness is deliberately false in one material instance the jury has the right to disregard all of his testimony not shown by other evidence to be true; also 'from that you have a right to conclude his statements in this case are wilfully and deliberately false.' The remarks cannot be said necessarily to go beyond the bounds of propriety.''

While examinations of various records on appeal in criminal cases disclose that few trial judges single out the testimony of a defendant for such comment, we cannot conclude that the trial judge here went beyond the limits imposed by the Constitution and the statute.

Complaint is made of instructions numbered 29 and 30, which, among other things, informed the jury in effect that a defendant may not by his own acts create a situation which would give rise to the appearance that his life was in danger and that he ''must himself have been without fault before he can claim full protection of the law.''

*People* v. *Conkling,* 111 Cal. 616 [44 P. 314], is a case in which defendant claimed the right to travel a private right of way over land possessed by deceased, which deceased had blocked to prevent its use. There the trial court gave a similar instruction which was held erroneous for two reasons applicable here. There, as here, there was no sufficient evi-

dence that defendant had created a situation which he could interpret as showing that he was in immediate peril of death or serious bodily injury, so that portion of the instruction was held inapplicable to the facts of the case. Further, it was held that the portion instructing the jury that the defendant must have been free from fault or forfeit the right of self-defense was entirely too broad, under the facts, as the jury might have concluded that the fault of the defendant in attempting to travel the roadway deprived him of the right of self-defense which is not the law.

█ Instruction number 31 was couched in the following language:

''It is the law that an owner of property who has requested a trespasser to leave, may lawfully use as much force as is reasonably necessary to remove the other; he may meet force with force and may increase such force to overcome that of the intruder. But this rule does not apply in favor of the trespasser, and if you find that the defendant was a trespasser upon the lands of the deceased, and that the deceased told or otherwise notified defendant to leave or keep off his property, it was the duty of defendant to leave or keep off deceased's property, and any use of force by defendant to resist the force exerted by the deceased was unlawful and without justification.''

Instructions numbered 32 and 33 were to the same general effect. A quite similar instruction was held to be erroneous in *People* v. *Conkling, supra,* where it was said:

''For a clear understanding of the evidence bearing upon the homicide the jury should have been enlightened upon these collateral questions to the extent of showing generally that deceased was in possession of the land as a lessee, that he obstructed the road leading over the land for the purpose of preventing travel thereon, and that defendant claimed that the road was such a road as that he had a right to travel over it, and the deceased had no right to prevent him from so doing. This was far enough for the evidence to go in this direction. It showed the facts leading up to the homicide, and all that was necessary for the jury to know in order to fully comprehend the case in its important essentials. There is no question of defense of property or habitation here which would justify the deceased in killing the defendant; nor any question of deceased's preventing defendant from exercising

a right which would in law justify defendant in killing the deceased. Conceding defendant had the legal right to travel the road, he was not justified in killing deceased in order that he might exercise that right; and, conceding defendant had no right to travel the road, deceased was not justified in killing him to prevent him from traveling it.''

As there were serious errors in the instructions, we must next consider the question of whether or not those errors resulted in a miscarriage of justice under the provisions of section 4½ of article VI of the Constitution.

In approaching this question we are impressed with the statements of defendant that deceased was retreating when the fatal shot was fired, that he was shot in the back and that markings on the ground indicate he was running away from defendant when the fatal shot was fired. Of course the defendant, when testifying, tried to minimize the damaging effect of his admission to the officers on the day of the killing by saying that defendant was jumping sideways to make himself a difficult target. This does not alter the established facts that deceased was killed by a shot in the back and that markings on the ground indicated that he was running away when the fatal shot was fired and that defendant so stated on the day of the killing.

The law of self-defense is based on the reasonable appearance of imminent peril of death of, or serious bodily injury to the party assailed. When that danger has passed and when the attacker has withdrawn from the combat, the defendant is not justified in pursuing him further and killing him, because the danger is not then imminent, and there is no apparent necessity to kill to prevent the death of or serious bodily injury to the defendant. (*People* v. *Conkling, supra; People* v. *Brown,* 62 Cal.App. 96 [216 P. 411] ; *People* v. *McCurdy,* 140 Cal.App. 499 [35 P.2d 569] ; *People* v. *Giovanni,* 45 Cal.App.2d 229 [113 P.2d 912] ; *People* v. *Spinelli,* 14 Cal.2d 137 [92 P.2d 1017].)

With evidence before it that deceased was running away when the fatal shot was fired, and the markings on the ground supporting that fact, coupled with the further fact that the fatal shot struck deceased in the back, we fail to understand how any intelligent jury could have found the defendant not guilty. Certainly, this establishes that Bagley had abandoned the conflict and was running away when defen-

dant killed him. Thus, danger to defendant was not imminent and under the law of self-defense he had no right to take the life of Bagley. In view of these facts, which were clearly placed before the jury, it does not seem reasonable to suppose that the erroneous instructions could have led that body into error when the evidence, including the statements of defendant himself, showed his guilt and that he had no right to kill when he did under the law of self-defense. We therefore conclude that there has been no miscarriage of justice in this case.

The judgment and order are affirmed.

Barnard, P. J., and Griffin, J., concurred.