[Crim. No. 682.   Fourth Dist.   Jan. 5, 1950.]

THE PEOPLE, Respondent, v. AGNES ELIZABETH GARNIER, Appellant.

Sam Houston Allen and William W. Shaw for Appellant.

Fred N. Howser, Attorney General, Dan Kaufman, Deputy Attorney General, and William O. Mackey, District Attorney, for Respondent.

GRIFFIN, Acting P. J.—Defendant was indicted for the murder of one John E. Owen on April 22, 1949. The jury found her guilty of manslaughter, an included offense. After denying defendant's motion for new trial and a motion in arrest of judgment, defendant appealed.

The appeal is based upon the following grounds: (1) that the trial court improperly instructed the jury; (2) that the court erred in allowing the defendant to be cross-examined on matters not covered in her direct examination; (3) that the court erred in permitting the prosecution to introduce improper rebuttal testimony; and (4) that the jury's verdict was contrary to the evidence in that the corpus delicti was not established prior to the admission into evidence of the extrajudicial statements of the defendant.

The defendant (aged 52) was the resident manager of an apartment house in Los Angeles, owned by the deceased, Mr. Owen. She met him in 1936 at which time she was employed by him. He was about 68 years of age, was married, but had separated from his wife temporarily in 1937, and after a reconciliation, separated permanently from her in 1944.

About 3 o'clock in the afternoon on April 22, defendant and the deceased left the apartment house bound for his ranch in West Riverside. Prior to their leaving they had engaged in an argument which was overheard by various persons, and during the course of this argument defendant applied coarse epithets towards him. They departed in the deceased's car and on arrival at the ranch were met by a Mrs. Austin, an employee of the deceased. After their arrival, the deceased proceeded to his bedroom downstairs. Defendant proceeded to the guest room in the upstairs portion of the house. After changing her clothes she seated herself in the lanai room. Mr. Owen came upstairs and proceeded to the bar where he poured himself a drink. Defendant began to quarrel with him about his drinking. He showed her certain drinking glasses which he had received as a present which defendant believed were sent to him by another woman. Some verbal altercation ensued. Defendant told Mr. Owen that she was going home and he threatened her that if she went home he would fire her. One of the ranch hands was called and asked to drive her to Los Angeles. A few minutes later deceased stated he was going to bed and proceeded downstairs through the hallway stairs. Defendant followed him and remained at the bottom landing watching Mr. Owen's shadow in his bedroom. When she no longer saw him moving around she went in and found him sitting in a chair. The deceased had a Colt Army Special 32-20 gun which he kept on a small table in his bedroom. According to the People's evidence the servant, Mrs. Austin, who was upstairs, heard defendant say something about a gun and she heard one discharged. She testified

that defendant came upstairs and said: "I shot Mr. Owen," whereupon she rushed downstairs, followed by defendant, and found him lying on the floor in the bedroom, and that defendant said: "Well, he tried to shoot me and I shot him." A ranch hand, deputy sheriffs and a physician were summoned. The ranch hand, according to his story proceeded down the stairs and as he passed defendant he asked her what had happened and she said: "I just shot the boss." Defendant was then sitting in a chair next to the bed and looked very calm and very cool. Her hair was in order and her clothing was all neat. Defendant told him that she and Owen had gone downstairs and that the "boss" had tussled with her; that she had lost an earring; that he had threatened her with a gun; that the deceased threw the gun down on the bed, walked away, and that she picked it up and called to him to stop; that the deceased turned around and faced her and laughed and started to walk away; and she shot him. He found the gun lying on the bed with one discharged shell.

A deputy sheriff testified that when they arrived they found defendant sitting in a chair and that he asked her what happened and she replied that Mr. Owen came at her with a gun and she took it away from him and hit him with it; that she didn't know anything about guns and that she didn't know that she ever had one in her hand before. He testified that as they were leaving the premises defendant told him: "I had to do it, it was either him or me"; that Mr. Owen was drunk and hit her several times and knocked one of her earrings off; that defendant stated that "where she was going it probably wouldn't make any difference whether she had an earring or not."

Later in the evening she made a statement to Deputy Sheriff Vivion, in which she related that she and the deceased left Los Angeles at 3 o'clock in the afternoon and on their arrival at the ranch a conversation ensued in which the name of an actress was mentioned repeatedly; that deceased recounted to her some of the parties he had attended in New York at the time he was there and referred to some drinking glasses he had received as a present from New York; that she was not interested in the glasses and did not wish to continue the conversation; that Mr. Owen told her he was going to send her back to Los Angeles and that she would be discharged; that he continued with his drinking and later started down to his bedroom; that she followed immediately behind him

and that he was staggering considerably; that he sat down in a chair in the bedroom and she went in and turned down the covers to the bed, which was her customary habit; that he became angry and abusive; that she retired from his room and on her return he was standing on the west side of his bed with the revolver in his hand; that he told her he would shoot her; that she went around the bed and approached him and took the revolver from his hand; that when Mr. Owen saw that she had taken the revolver from him he started away and at that time she heard a report and he fell to the floor; that she did not go to his aid because he had feigned sinking spells in order to gain her sympathy on other occasions; that when he did not arise she tossed the gun on the bed and left the room for the purpose of obtaining aid; that she did not know what happened when the gun was discharged.

Vivion testified that on April 22 he found an earring in the pocket of a shirt hanging on the door opening from the office section into the bedroom of Mr. Owen, and that it was similar to the earring taken from the defendant. In the possession of the defendant at the time of her booking were two type-written sheets and a small clipping from a newspaper. The typewritten matter consisted of the recital of the activities of Mr. Owen on his trip to Washington, his association with an actress appeared prominently in these recitals. It mentioned an argument between the deceased and defendant before he left for Washington and the fact that he was finding fault with everything she did and that defendant was checking his activities on his trip to New York.

At the trial a group of witnesses testified to conversations with defendant in which she indicated her dissatisfaction with her association with Mr. Owen, her fear of discharge, her reluctance to lose that association, and more particularly, her position. She mentioned taking a course in real estate and that she was going to leave his employ; that she had been working for him about 15 years and was not getting any younger, and stated: ''If I can't have him nobody else will''; and that one witness heard her say to Mr. Owen: ''You will either marry me or pay me off''; that ''. . . he will have a ——— of a time getting rid of me. I am not that easy to get rid of.'' There is testimony by one witness that in a conversation with defendant in June, 1948, defendant inquired about acquiring a gun for her protection; that in a conversation with one of the clerks at the Dubarry Apartments about

two months prior to the trial defendant told him she was going to have a "showdown with the boss" when he came back, that she was getting sick of it.

It was stipulated that the bullet which killed Mr. Owen was fired from the gun found in the bedroom. The caretaker had left it there loaded but had removed one shell in the chamber immediately opposite the hammer. There was testimony that showed that a single action "pull" (fired from the cocked position) required a pull of 5-½ pounds, and that a double action "pull" (pulled on trigger) required a pull of 13 pounds. The medical testimony shows that the bullet entered his body on the left side at about the eighth rib and traveled slightly upward, emerging at the sixth rib on the right side, and that the muzzle of the gun was approximately 12 inches from the point of entry at the time the gun was discharged.

At the trial, on direct examination, defendant, without further explanation, adopted the story which she told Deputy Sheriff Vivion, as her version of what took place in the bedroom on the evening Mr. Owen lost his life. She then introduced a large amount of correspondence from Mr. Owen to her during the latter years of her employment, for the purpose of showing the attitude and relationship between them. On cross-examination, her testimony was somewhat at variance with the story related to Deputy Sheriff Vivion. She stated that when she entered the bedroom Mr. Owen's eyes were closed and he appeared to be going to sleep; that she started to take his shoes off and this made him angry; that she reached for his glasses and he started slapping her and cursing her and hitting her on both sides of her face with both hands as hard as he could and that she pushed him back into his chair when he started to arise; that when she turned he arose and said: "I am going to kill you"; that he had the gun in his hand; that she grabbed it out of his hands and the next thing she was standing up and the gun was up in the air pointed to the ceiling and that her arm that was holding it seemed to be frozen and that she could not move it; that she grabbed her arm and pulled it down, the gun was discharged, and Mr. Owen was on the floor. She stated that Mr. Owen had abused her verbally when he threatened her. She denied the conversations claimed to have been had with her by the witnesses who testified for the prosecution. She denied ever having a gun in her possession before, or ever carrying one in her purse.

She stated that Mr. Owen was going to meet his wife and make arrangements for a settlement and a divorce from her.

The prosecution, on rebuttal, introduced the testimony of several witnesses indicating that the reputation of the defendant for truth and veracity in the community was bad, and produced a witness indicating that defendant was carrying a gun in her purse on a previous occasion, notwithstanding defendant's denial of this fact, "for the protection of Mr. Owen." Defendant then proceeded to introduce a letter from Mr. Owen dated April 19, 1949, in which he acknowledged his love for her. The parties rested their case.

At the request of the People, the court instructed the jury that "The right of self-defense is not available to a person who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault, for in such a case the original intent would control."

It is argued that even though the instruction correctly stated an abstract principle of law, there was no evidence that defendant instigated a quarrel or "sought a quarrel" for any purpose whatsoever and therefore the instruction was not applicable and it was prejudicial error to give it, citing such cases as *People* v. *Campanella*, 39 Cal.App.2d 384 [103 P.2d 193] ; *People* v. *Keys*, 62 Cal.App.2d 903 [145 P.2d 589] ; *People* v. *Conkling*, 111 Cal. 616 [44 P. 314] ; *People* v. *Hatchett*, 63 Cal.App.2d 144 [146 P.2d 469] ; and *People* v. *Huntington*, 138 Cal. 261 [70 P. 284].

The evidence clearly discloses that defendant and deceased had been quarreling since 3 o'clock on the day of the shooting. As suggested, the quarrel had reached such a point that the status of defendant's position as an employee of the deceased was left considerably in doubt. Mr. Owen, after the quarrel, proceeded downstairs and there was no apparent necessity for defendant to follow him to his bedroom. She was free to leave at any time. In fact, the ranch hand had been called by deceased to take her back to Los Angeles. This was some evidence, though slight, from which the jury might have believed that the defendant followed the deceased to his room for the reason of provoking a further quarrel. However, it does not reasonably appear that it was for the purpose of "forcing a deadly issue."

It is difficult to determine whether the defendant in this action was relying upon the claim of self-defense, accidental

shooting, or that the wound was self-inflicted .She testified that she was not afraid of the deceased when the gun was in his possession; that she took it from him with very little difficulty and that he had been drinking and he was "like a baby" and was "easy to handle."

The instruction, as given, concededly was proper in form, as an abstract principle of law. (*People* v. *Hinshaw,* 194 Cal. 1 [227 P. 156] ; CALJIC Inst. No. 325, p. 302.) Under the facts brought out in *People* v. *Hinshaw, supra,* such an instruction was proper. Applying the instruction, as given, to the facts in the instant case, the evidence may have fallen short of establishing all of the facts necessary to be established. Considering the weakness of the evidence on the question of self-defense, and in view of the fact that the jury was otherwise fully instructed on the law of self-defense and that defendant was convicted only of the lesser offense of manslaughter, it does not seem reasonable to suppose that a miscarriage of justice, under the provision of section 4½ of article VI of the Constitution resulted by reason of the giving of such an abstract instruction or that the jurors were thereby led into error in arriving at such a verdict. (*People* v. *Keys,* 62 Cal.App.2d 903 [145 P.2d 589] ; *People* v. *Glover,* 141 Cal. 233 [74 P. 745] ; *People* v. *Soules,* 41 Cal.App.2d 298 [106 P.2d 639].)

██   The trial court gave an instruction on excusable homicide in the language of CALJIC Instruction No. 320, page 289, to the effect that:

"The killing of a human being is excusable and not unlawful: 1. When committed by accident and misfortune in doing any lawful act by lawful means and without any unlawful intent, and where the person causing the death acted with that care and caution which would be exercised by the ordinarily careful and prudent individual under like circumstances. 2. When committed by accident and misfortune in the heat of passion upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken nor any dangerous weapon is used, and when the killing is not done in a cruel or unusual manner.

"Excusable homicide is distinguished from felonious homicide in that to be excusable the killing of the human being must have been by both accident and misfortune. *Even though* the death was accidental and may not have been intended and was not anticipated, the homicide will not be excused if

it was caused by *an unlawful act,* or by the doing of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.''

Defendant complains of the italicized portion and claims that there was no evidence from which the jury could have found her guilty of involuntary manslaughter arising from an *unlawful act* on her part, citing *People* v. *Sanchez,* 30 Cal.2d 560 [184 P.2d 673]. It is true that only that portion of the above-quoted instruction should be given which is applicable to the evidence in the case. As stated in *People* v. *Sanchez, supra,* the court should not state a principle of law which has no application to the facts of the case. However, in the instant case, there is sufficient evidence to support a conviction of manslaughter under the other alternatives mentioned in that same paragraph. The giving of the portion of the instruction complained of is not prejudicial error under the facts of the case. (*People* v. *Sanchez, supra.*)

■ The next complaint involves an instruction given as follows:

''CORPUS DELICTI MUST FIRST BE PROVED. The guilt of a defendant may not be established *alone* by any statement made by her outside of this trial. Before any person may be convicted of a criminal offense, there must be proof, independent of any such statement, that the crime in question was committed . . . . .''

It is defendant's contention that this instruction tells the jury that the corpus delicti may be established *in part* by extrajudicial statements of the defendant, whereas, the true rule is that there must be proof, independent of any such statement, *sufficient of itself,* to establish that the deceased met death through a criminal agency, citing *People* v. *Hudson,* 139 Cal.App. 543 [34 P.2d 741; *People* v. *Tugwell,* 28 Cal.App. 348 [153 P. 740]; and *People* v. *Ives,* 17 Cal.2d 459 [110 P.2d 408]. The instruction, as given, is substantially that prescribed in CALJIC Instruction No. 29C, Alternate, page 44, and is clearly in accord with the rules laid down in *People* v. *Selby,* 198 Cal. 426 [245 P. 426]; *People* v. *McMonigle,* 29 Cal.2d 730 [177 P.2d 745]; *People* v. *King,* 30 Cal.App.2d 185 [85 P.2d 928]; *People* v. *Hammond,* 26 Cal.App.2d 145 [78 P.2d 1172]; and *People* v. *Ives, supra,* cited by defendant.

■ The court gave the instruction found in CALJIC, No. 311-A, page 276, respecting the fact that neither the ''passion of fear,'' of itself, nor other described passions, in and of themselves ''constitute the heat of passion referred

to in the law of manslaughter. . . ." This was followed by an instruction distinguishing manslaughter from murder and stating that "The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances," and that "A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable person if likewise situated," which instruction is in the language of CALJIC No. 311, Alternate, page 275.

Defendant argues that "fear is an emotion" and "has nothing to do with passion"; and that the statement used must have confused the jury, and that by the instruction, as given, the jury was told that as a matter of law the conduct of defendant could not be justified by "the reason of fear, of itself." Webster's New International Dictionary, in defining passion, includes *fear*, hate, love and joy within its definition, and also includes violent and intense emotions. When the entire instruction, of which defendant complains is considered, it is clear that it is complementary to the preceding instruction which gave to the jury the test for heat of passion and, as given, it is a correct statement of the law and was properly given. It sufficiently covered the proffered instruction offered by defendant and refused. (*People* v. *Logan,* 175 Cal. 45, 49 [164 P. 1121] ; *People* v. *Valentine,* 28 Cal.2d 121, 139 [169 P.2d 1] ; Horton on Criminal Law, vol. 1, p. 648.)

The next complaint involves an instruction as follows: "Before you may return a verdict in this case, you must agree unanimously not only as to the innocence or guilt of the defendant, but also, if you should find her guilty, as to the *degree* of her offense." This was followed by an instruction: "If you find that a defendant was guilty of an offense included within the charge of the indictment, but entertain a reasonable doubt as to the degree of the crime of which *she is guilty,* it is your duty to convict the defendant only of the lesser offense." Defendant claims that there is no degree where manslaughter is involved and therefore the instruction was erroneous to that extent; that the second portion of the instruction, as worded, assumed as a fact that defendant was guilty of some crime. It is obvious, from the arrangement of

the instruction, as given, pertaining to the first complaint, that the court was referring to the charge of murder. Considering the instructions as a whole, the jury could not have been misled. Likewise, the second portion was fully covered by proper instructions which fully developed the true import of that instruction. No error was committed and no prejudicial error resulted. (*People* v. *Latona,* 2 Cal.2d 714, 727 [43 P.2d 260]; *People* v. *Swift,* 66 Cal. 348 [5 P. 505]; *People* v. *McGee,* 31 Cal.2d 229 [187 P.2d 706].)

█ The last instruction objected to recites that: "I instruct you further that you are not permitted, on circumstantial evidence *alone,* to find the defendant guilty of the crime charged against *him,* unless the proved circumstances not only are consistant with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion." This instruction appears in CALJIC, Instruction No. 27, page 30. In connection therewith CALJIC, Instruction No. 28, page 31, was also given on the same subject. The defendant's complaint of the first instruction is that the court was in error in using the word "alone" (italicized), and that the instruction, as given, should have stated that if "any part of the evidence" is circumstantial, the trial court is obligated, on its own motion, to give such an instruction as was proffered by her in the language suggested in the case of *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]. It is true that in that case the word "alone" is not used. The holding is that where "circumstantial evidence is substantially relied upon" for proof of guilt, an adequate instruction is required. The two instructions, as given, sufficiently cover the subject matter and are not prejudicially erroneous. (*People* v. *Koenig,* 29 Cal.2d 87, 93 [173 P.2d 1]; *People* v. *Bender, supra; People* v. *Owens,* 79 Cal.App.2d 290, 297 [179 P.2d 401].)

█ The next point raised is that by the cross-examination of the defendant her constitutional rights were interfered with and she cites section 13, article I of the Constitution and *People* v. *Arrighini,* 122 Cal. 121 [54 P. 591]. Defendant was on the witness stand for approximately two days and practically all of her testimony was devoted to reading into evidence scores of letters written to her over a period of years by the deceased. She then testified that what she told Officer Vivion as what transpired in Mr. Owen's bedroom on the evening he lost his life was substantially correct. On cross-examination the prosecution sought to elicit from her

an admission that she and the deceased had quarreled prior to their departure for Riverside that afternoon. Counsel for defendant objected on the ground that it was not proper cross-examination and the court overruled the objection. Defendant contends that the cross-examination was limited to what occurred in Mr. Owen's bedroom on that evening and that therefore the objection should have been sustained. There is no merit to this contention. Section 1323 of the Penal Code provides that a defendant in a criminal action or proceeding cannot be compelled to be a witness against himself, but if he offers himself as a witness he may be cross-examined by counsel for the People as to all matters on which he was examined in chief. The letters covered a period of several months' time and were offered for the purpose of establishing the deceased's affection for and devotion to her over this period of time. The examination was therefore relevant. She was likewise interrogated as to her conversations with other people during this period in which she allegedly stated that "I hate Mr. Owen and I will never marry him." Such statements as that were offered for the purpose of impeaching some of the contents of the letters written to the defendant by the deceased and which were introduced by her on direct examination. The relationship of the defendant and the deceased was material on the question of motive and this fact was recognized by both the prosecution and by the defense by the letters which she had introduced in her case in chief. It was proper to show that she made prior contradictory and inconsistent statements concerning the question of her motive. She chose to deny the claimed conversations with others and the prosecution was properly allowed to subsequently show that such conversations had in fact taken place. (*People* v. *Tuthill*, 31 Cal.2d 92, 99 [187 P.2d 16].)

It is next claimed that the trial court erred to defendant's prejudice in permitting the prosecution to introduce improper rebuttal testimony. It is claimed that Florence Owen, wife of the deceased, was called as a "rebuttal witness" for the single purpose of endeavoring to persuade the jury that the defendant had broken up an erstwhile happy relationship between herself and the deceased. This witness was first called on behalf of the prosecution. She merely identified the body of her husband as the same person mentioned in the indictment. As a rebuttal witness, she testified, without objections, in reference to the date of their claimed

separation, which date was somewhat at variance with that testified to by the defendant. The witness was then thoroughly cross-examined as to her relationship with Mrs. Garnier, the defendant. Other rebuttal witnesses were produced to impeach the testimony of the defendant elicited on cross-examination as to certain statements she denied making to these particular witnesses. No objection was ever made to this particular testimony, no motion was made to strike it, and it appears that the complaint as to this rebuttal testimony was made for the first time on appeal. Under the circumstances, no prejudicial error may be claimed. (*People* v. *Guiterez,* 126 Cal.App. 526, 530 [14 P.2d 838] ; *People* v. *Lewandowski,* 143 Cal. 574, 579 [77 P. 467].)

Lastly, the complaint that the evidence did not, as a matter of law, support the verdict of the jury for the reasons stated, is untenable. It seems to be the argument of defendant that in the absence of her extrajudicial statements, the evidence before the jury and the court could only warrant a conclusion that the wound which the deceased received was either self-inflicted, or was occasioned by accident. It is now well settled in this state that the corpus delicti need not be established beyond a reasonable doubt in order to permit the introduction of admissions of the defendant, and such extrajudicial statements, admissions or confessions may be admitted in evidence upon the prima facie proof of the corpus delicti. (*People* v. *McMonigle,* 29 Cal.2d 730, 738 [177 P.2d 745] ; *People* v. *Seymour,* 54 Cal.App.2d 266, 275 [128 P.2d 726] ; *People* v. *Day,* 71 Cal.App.2d 1, 3 [161 P.2d 803] ; *People* v. *Ford,* 85 Cal.App. 258, 260 [258 P. 1111] ; *People* v. *Grill,* 151 Cal. 592, 595 [91 P. 515] ; *People* v. *Searle,* 33 Cal.App. 228, 231 [164 P. 819].) There was sufficient prima facie proof of the corpus delicti shown.

Judgment and order affirmed.

Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 2, 1950.